(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PERRY *v.* NEW HAMPSHIRE

CERTIORARI TO THE SUPREME COURT OF NEW HAMPSHIRE

No. 10–8974.   Argued November 2, 2011—Decided January 11, 2012

Around 3 a.m. on August 15, 2008, the Nashua, New Hampshire Police Department received a call reporting that an African-American male was trying to break into cars parked in the lot of the caller's apartment building.  When an officer responding to the call asked eyewitness Nubia Blandon to describe the man, Blandon pointed to her kitchen window and said the man she saw breaking into the car was standing in the parking lot, next to a police officer.  Petitioner Barion Perry's arrest followed this identification.

Before trial, Perry moved to suppress Blandon's identification on the ground that admitting it at trial would violate due process.  The New Hampshire trial court denied the motion.  To determine whether due process prohibits the introduction of an out-of-court identification at trial, the Superior Court said, this Court's decisions instruct a two-step inquiry: The trial court must first decide whether the police used an unnecessarily suggestive identification procedure; if they did, the court must next consider whether that procedure so tainted the resulting identification as to render it unreliable and thus inadmissible.  Perry's challenge, the court found, failed at step one, for Blandon's identification did not result from an unnecessarily suggestive procedure employed by the police.  A jury subsequently convicted Perry of theft by unauthorized taking.

On appeal, Perry argued that the trial court erred in requiring an initial showing that police arranged a suggestive identification procedure.  Suggestive circumstances alone, Perry contended, suffice to require court evaluation of the reliability of an eyewitness identification before allowing it to be presented to the jury.  The New Hampshire Supreme Court rejected Perry's argument and affirmed his conviction.

*Held:* The Due Process Clause does not require a preliminary judicial

inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.  Pp. 6–19.

   (a) The Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.  Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice,"  *Dowling* v. *United States*, 493 U. S. 342, 352 (internal quotation marks omitted), does the Due Process Clause preclude its admission.

   Contending that the Due Process Clause is implicated here, Perry relies on a series of decisions involving police-arranged identification procedures.  See *Stovall* v. *Denno*, 388 U. S. 293; *Simmons* v. *United States*, 390 U. S. 377; *Foster* v. *California*, 394 U. S. 440; *Neil* v. *Biggers*, 409 U. S. 188; and *Manson* v. *Brathwaite*, 432 U. S. 98.  These cases detail the approach appropriately used to determine whether due process requires suppression of an eyewitness identification tainted by police arrangement.  First, due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.  *Id.,* at 107, 109; *Biggers*, 409 U. S., at 198.  Even when the police use such a procedure, however, suppression of the resulting identification is not the inevitable consequence.  *Brathwaite,* 432 U. S., at 112–113; *Biggers,* 409 U. S., at 198–199.  Instead, due process requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification."  *Id.,* at 201.  "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation.  *Brathwaite*, 432 U. S., at 114.  Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed.  *Id.,* at 114, 116.  Otherwise, the identification, assuming no other barrier to its admission, should be submitted to the jury.  Pp. 6–10.

   (b) Perry argues that it was mere happenstance that all of the cases in the *Stovall* line involved improper police action.  The rationale underlying this Court's decisions, Perry asserts, calls for a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances.  This Court disagrees.

   If "reliability is the linchpin" of admissibility under the Due Process Clause, *Brathwaite,* 432 U. S., at 114, Perry contends, it should not matter whether law enforcement was responsible for creating the suggestive circumstances that marred the identification.  This argu-

ment removes *Brathwaite*'s statement from its mooring, attributing to it a meaning that a fair reading of the opinion does not bear. The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct.

Perry's contention also ignores a key premise of *Brathwaite:* A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances is to deter law enforcement use of improper procedures in the first place. This deterrence rationale is inapposite in cases, like Perry's, where there is no improper police conduct. Perry also places significant weight on *United States* v. *Wade,* 388 U. S. 218, describing it as a decision not anchored to improper police conduct. But the risk of police rigging was the very danger that prompted the Court in *Wade* to extend a defendant's right to counsel to cover postindictment lineups and showups.

Perry's position would also open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications. There is no reason why an identification made by an eyewitness with poor vision or one who harbors a grudge against the defendant, for example, should be regarded as inherently more reliable than Blandon's identification here. Even if this Court could, as Perry contends, distinguish "suggestive circumstances" from other factors bearing on the reliability of eyewitness evidence, Perry's limitation would still involve trial courts, routinely, in preliminary examinations, for most eyewitness identifications involve some element of suggestion. Pp. 10–14.

(c) In urging a broadly applicable rule, Perry maintains that eyewitness identifications are uniquely unreliable. The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen the evidence for reliability before allowing the jury to assess its creditworthiness. The Court's unwillingness to adopt such a rule rests, in large part, on its recognition that the jury, not the judge, traditionally determines the reliability of evidence. It also takes account of other safeguards built into the adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability. These protections include the defendant's Sixth Amendment rights to counsel and to confront and cross-examine the eyewitness, eyewitness-specific instructions warning juries to take care in appraising identification evidence, and state and federal rules of evidence permitting trial judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury. Many of these safeguards were availed of by Perry's defense. Given the safeguards generally applicable in criminal trials, the introduction of Blandon's eyewitness tes-

Syllabus

timony, without a preliminary judicial assessment of its reliability, did not render Perry's trial fundamentally unfair.  Pp. 14–18.

Affirmed.

    GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, ALITO, and KAGAN, JJ., joined.  THOMAS, J., filed a concurring opinion.  SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 10–8974

### BARION PERRY, PETITIONER *v.* NEW HAMPSHIRE

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEW HAMPSHIRE

[January 11, 2012]

JUSTICE GINSBURG delivered the opinion of the Court.

In our system of justice, fair trial for persons charged with criminal offenses is secured by the Sixth Amendment, which guarantees to defendants the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution. Those safeguards apart, admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine. This Court has recognized, in addition, a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime.

An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," *Simmons* v. *United States*, 390 U. S. 377, 384 (1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the

police-arranged suggestive circumstances, the identifica-
tion evidence ordinarily will be admitted, and the jury will
ultimately determine its worth.

We have not extended pretrial screening for reliability
to cases in which the suggestive circumstances were not
arranged by law enforcement officers. Petitioner requests
that we do so because of the grave risk that mistaken
identification will yield a miscarriage of justice.[1] Our
decisions, however, turn on the presence of state action
and aim to deter police from rigging identification proce-
dures, for example, at a lineup, showup, or photograph
array. When no improper law enforcement activity is
involved, we hold, it suffices to test reliability through the
rights and opportunities generally designed for that pur-
pose, notably, the presence of counsel at postindictment
lineups, vigorous cross-examination, protective rules of evi-
dence, and jury instructions on both the fallibility of
eyewitness identification and the requirement that guilt
be proved beyond a reasonable doubt.

## I

## A

Around 3 a.m. on August 15, 2008, Joffre Ullon called
the Nashua, New Hampshire, Police Department and

––––––––––

[1] The dissent, too, appears to urge that all suggestive circumstances
raise due process concerns warranting a pretrial ruling. See *post,* at 6,
9, 14–17. Neither Perry nor the dissent, however, points to a single
case in which we have required pretrial screening absent a police-
arranged identification procedure. Understandably so, for there are no
such cases. Instead, the dissent surveys our decisions, heedless of the
police arrangement that underlies every one of them, and inventing a
"longstanding rule," *post,* at 6, that never existed. Nor are we, as the
dissent suggests, imposing a *mens rea* requirement, *post,* at 1, 7, or
otherwise altering our precedent in any way. As our case law makes
clear, what triggers due process concerns is police use of an unneces-
sarily suggestive identification procedure, whether or not they intended
the arranged procedure to be suggestive.

reported that an African-American male was trying to break into cars parked in the lot of Ullon's apartment building. Officer Nicole Clay responded to the call. Upon arriving at the parking lot, Clay heard what "sounded like a metal bat hitting the ground." App. 37a–38a. She then saw petitioner Barion Perry standing between two cars. Perry walked toward Clay, holding two car-stereo amplifiers in his hands. A metal bat lay on the ground behind him. Clay asked Perry where the amplifiers came from. "[I] found them on the ground," Perry responded. *Id.,* at 39a.

Meanwhile, Ullon's wife, Nubia Blandon, woke her neighbor, Alex Clavijo, and told him she had just seen someone break into his car. Clavijo immediately went downstairs to the parking lot to inspect the car. He first observed that one of the rear windows had been shattered. On further inspection, he discovered that the speakers and amplifiers from his car stereo were missing, as were his bat and wrench. Clavijo then approached Clay and told her about Blandon's alert and his own subsequent observations.

By this time, another officer had arrived at the scene. Clay asked Perry to stay in the parking lot with that officer, while she and Clavijo went to talk to Blandon. Clay and Clavijo then entered the apartment building and took the stairs to the fourth floor, where Blandon's and Clavijo's apartments were located. They met Blandon in the hallway just outside the open door to her apartment.

Asked to describe what she had seen, Blandon stated that, around 2:30 a.m., she saw from her kitchen window a tall, African-American man roaming the parking lot and looking into cars. Eventually, the man circled Clavijo's car, opened the trunk, and removed a large box.[2]

---

[2] The box, which Clay found on the ground near where she first encountered Perry, contained car-stereo speakers. App. 177a–178a.

Clay asked Blandon for a more specific description of the man.  Blandon pointed to her kitchen window and said the person she saw breaking into Clavijo's car was standing in the parking lot, next to the police officer.  Perry's arrest followed this identification.

About a month later, the police showed Blandon a photographic array that included a picture of Perry and asked her to point out the man who had broken into Clavijo's car.  Blandon was unable to identify Perry.

B

Perry was charged in New Hampshire state court with one count of theft by unauthorized taking and one count of criminal mischief.[3]  Before trial, he moved to suppress Blandon's identification on the ground that admitting it at trial would violate due process.  Blandon witnessed what amounted to a one-person showup in the parking lot, Perry asserted, which all but guaranteed that she would identify him as the culprit.  *Id.,* at 15a–16a.

The New Hampshire Superior Court denied the motion. *Id.,* at 82a–88a.  To determine whether due process prohibits the introduction of an out-of-court identification at trial, the Superior Court said, this Court's decisions instruct a two-step inquiry.  First, the trial court must decide whether the police used an unnecessarily suggestive identification procedure.  *Id.,* at 85a.  If they did, the court must next consider whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible.  *Ibid.* (citing *Neil* v. *Biggers*, 409 U. S. 188 (1972), and *Manson* v. *Brathwaite*, 432 U. S. 98 (1977)).

Perry's challenge, the Superior Court concluded, failed at step one: Blandon's identification of Perry on the night

———————
[3] The theft charge was based on the taking of items from Clavijo's car, while the criminal mischief count was founded on the shattering of Clavijo's car window.

of the crime did not result from an unnecessarily suggestive procedure "manufacture[d] . . . by the police." App. 86a–87a. Blandon pointed to Perry "spontaneously," the court noted, "without any inducement from the police." *Id.,* at 85a–86a. Clay did not ask Blandon whether the man standing in the parking lot was the man Blandon had seen breaking into Clavijo's car. *Ibid.* Nor did Clay ask Blandon to move to the window from which she had observed the break-in. *Id.,* at 86a.

The Superior Court recognized that there were reasons to question the accuracy of Blandon's identification: the parking lot was dark in some locations; Perry was standing next to a police officer; Perry was the only African-American man in the vicinity; and Blandon was unable, later, to pick Perry out of a photographic array. *Id.,* at 86a–87a. But "[b]ecause the police procedures were not unnecessarily suggestive," the court ruled that the reliability of Blandon's testimony was for the jury to consider. *Id.,* at 87a.

At the ensuing trial, Blandon and Clay testified to Blandon's out-of-court identification. The jury found Perry guilty of theft and not guilty of criminal mischief.

On appeal, Perry repeated his challenge to the admissibility of Blandon's out-of-court identification. The trial court erred, Perry contended, in requiring an initial showing that the police arranged the suggestive identification procedure. Suggestive circumstances alone, Perry argued, suffice to trigger the court's duty to evaluate the reliability of the resulting identification before allowing presentation of the evidence to the jury.

The New Hampshire Supreme Court rejected Perry's argument and affirmed his conviction. *Id.,* at 9a–11a. Only where the police employ suggestive identification techniques, that court held, does the Due Process Clause require a trial court to assess the reliability of identification evidence before permitting a jury to consider it. *Id.,*

at 10a–11a.

We granted certiorari to resolve a division of opinion on the question whether the Due Process Clause requires a trial judge to conduct a preliminary assessment of the reliability of an eyewitness identification made under suggestive circumstances not arranged by the police. 563 U. S. ___ (2011).[4]

## II
## A

The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, *Gideon* v. *Wainwright*, 372 U. S. 335, 343–345 (1963); compulsory process, *Taylor* v. *Illinois*, 484 U. S. 400, 408–409 (1988); and confrontation plus cross-examination of witnesses, *Delaware* v. *Fensterer*, 474 U. S. 15, 18–20 (1985) *(per curiam)*.

––––––––––

[4] Compare *United States* v. *Bouthot*, 878 F. 2d 1506, 1516 (CA1 1989) (Due process requires federal courts to "scrutinize all suggestive identification procedures, not just those orchestrated by the police."); *Dunnigan* v. *Keane*, 137 F. 3d 117, 128 (CA2 1998) (same); *Thigpen* v. *Cory*, 804 F. 2d 893, 895 (CA6 1986) (same), with *United States* v. *Kimberlin*, 805 F. 2d 210, 233 (CA7 1986) (Due process check is required only in cases involving improper state action.); *United States* v. *Zeiler*, 470 F. 2d 717, 720 (CA3 1972) (same); *State* v. *Addison*, 160 N. H. 792, 801, 8 A. 3d 118, 125 (2010) (same); *State* v. *Reid*, 91 S. W. 3d 247, 272 (Tenn. 2002) (same); *State* v. *Nordstrom*, 200 Ariz. 229, 241, 25 P. 3d 717, 729 (2001) (same); *Semple* v. *State*, 271 Ga. 416, 417–418, 519 S. E. 2d 912, 914–915 (1999) (same); *Harris* v. *State*, 619 N. E. 2d 577, 581 (Ind. 1993) (same); *State* v. *Pailon*, 590 A. 2d 858, 862–863 (R. I. 1991) (same); *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 541–542, 562 N. E. 2d 797, 805 (1990) (same); *State* v. *Brown*, 38 Ohio St. 3d 305, 310–311, 528 N. E. 2d 523, 533 (1988) (same); *Wilson* v. *Commonwealth*, 695 S. W. 2d 854, 857 (Ky. 1985) (same).

Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. See *Kansas* v. *Ventris*, 556 U. S. 586, 594, n. (2009) ("Our legal system . . . is built on the premise that it is the province of the jury to weigh the credibility of competing witnesses."). Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," *Dowling* v. *United States*, 493 U. S. 342, 352 (1990) (internal quotation marks omitted), have we imposed a constraint tied to the Due Process Clause. See, *e.g., Napue* v. *Illinois*, 360 U. S. 264, 269 (1959) (Due process prohibits the State's "knowin[g] use [of] false evidence," because such use violates "any concept of ordered liberty.").

Contending that the Due Process Clause is implicated here, Perry relies on a series of decisions involving police-arranged identification procedures. In *Stovall* v. *Denno*, 388 U. S. 293 (1967), first of those decisions, a witness identified the defendant as her assailant after police officers brought the defendant to the witness' hospital room. *Id.,* at 295. At the time the witness made the identification, the defendant—the only African-American in the room—was handcuffed and surrounded by police officers. *Ibid.* Although the police-arranged showup was undeniably suggestive, the Court held that no due process violation occurred. *Id.,* at 302. Crucial to the Court's decision was the procedure's necessity: The witness was the only person who could identify or exonerate the defendant; the witness could not leave her hospital room; and it was uncertain whether she would live to identify the defendant in more neutral circumstances. *Ibid.*

A year later, in *Simmons* v. *United States*, 390 U. S. 377 (1968), the Court addressed a due process challenge to police use of a photographic array. When a witness identi-

fies the defendant in a police-organized photo lineup, the Court ruled, the identification should be suppressed only where "the photographic identification procedure was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.,* at 384–385. Satisfied that the photo array used by Federal Bureau of Investigation agents in *Simmons* was both necessary and unlikely to have led to a mistaken identification, the Court rejected the defendant's due process challenge to admission of the identification. *Id.,* at 385–386. In contrast, the Court held in *Foster* v. *California*, 394 U. S. 440 (1969), that due process required the exclusion of an eyewitness identification obtained through police-arranged procedures that "made it all but inevitable that [the witness] would identify [the defendant]." *Id.,* at 443.

Synthesizing previous decisions, we set forth in *Neil* v. *Biggers*, 409 U. S. 188 (1972), and reiterated in *Manson* v. *Brathwaite*, 432 U. S. 98 (1977), the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Id.,* at 107, 109; *Biggers*, 409 U. S., at 198. Even when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence. *Brathwaite*, 432 U. S., at 112–113; *Biggers*, 409 U. S., at 198–199.

A rule requiring automatic exclusion, the Court reasoned, would "g[o] too far," for it would "kee[p] evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." *Brathwaite*, 432 U. S., at 112; see *id.,* at 113 (when an "identification is reliable despite an unnecessarily suggestive [police] identification procedure," automatic exclusion "is a Draconian

sanction," one "that may frustrate rather than promote justice").

Instead of mandating a *per se* exclusionary rule, the Court held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." *Biggers*, 409 U. S., at 201; see *Brathwaite*, 432 U. S., at 116. "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation, the Court stated in *Brathwaite*. *Id.,* at 114. Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. *Id.,* at 114, 116. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury.[5]

Applying this "totality of the circumstances" approach, *id.,* at 110, the Court held in *Biggers* that law enforcement's use of an unnecessarily suggestive showup did not require suppression of the victim's identification of her assailant. 409 U. S., at 199–200. Notwithstanding the improper procedure, the victim's identification was reliable: She saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the person she had seen. *Id.,* at 200 (internal quotation marks omitted). Similarly, the Court concluded in *Brathwaite* that police use of an unnecessarily suggestive photo array did not

———————

[5] Among "factors to be considered" in evaluating a witness' "ability to make an accurate identification," the Court listed: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite*, 432 U. S. 98, 114 (1977) (citing *Neil* v. *Biggers*, 409 U. S. 188, 199–200 (1972)).

require exclusion of the resulting identification. 432 U. S., at 114–117. The witness, an undercover police officer, viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification. *Id.,* at 115. Hence, the "indicators of [the witness'] ability to make an accurate identification [were] hardly outweighed by the corrupting effect of the challenged identification." *Id.,* at 116.

### B

Perry concedes that, in contrast to every case in the *Stovall* line, law enforcement officials did not arrange the suggestive circumstances surrounding Blandon's identification. See Brief for Petitioner 34; Tr. of Oral Arg. 5 (counsel for Perry) ("[W]e do not allege any manipulation or intentional orchestration by the police."). He contends, however, that it was mere happenstance that each of the *Stovall* cases involved improper police action. The rationale underlying our decisions, Perry asserts, supports a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances. We disagree.

Perry's argument depends, in large part, on the Court's statement in *Brathwaite* that "reliability is the linchpin in determining the admissibility of identification testimony." 432 U. S., at 114. If reliability is the linchpin of admissibility under the Due Process Clause, Perry maintains, it should make no difference whether law enforcement was responsible for creating the suggestive circumstances that marred the identification.

Perry has removed our statement in *Brathwaite* from its mooring, and thereby attributes to the statement a meaning a fair reading of our opinion does not bear. As just explained, *supra,* at 8–9, the *Brathwaite* Court's reference to reliability appears in a portion of the opinion concerning the appropriate remedy *when the police use an unneces-*

*sarily suggestive identification procedure.* The Court adopted a judicial screen for reliability as a course preferable to a *per se* rule requiring exclusion of identification evidence whenever law enforcement officers employ an improper procedure. The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct. The very purpose of the check, the Court noted, was to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct. 432 U. S., at 112–113.[6]

Perry's contention that improper police action was not essential to the reliability check *Brathwaite* required is echoed by the dissent. *Post,* at 3–4. Both ignore a key premise of the *Brathwaite* decision: A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances, the Court said, is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place. See 432 U. S., at 112. Alerted to the prospect that identification evidence improperly obtained may be excluded, the Court reasoned, police officers will "guard against unnecessarily suggestive procedures." *Ibid.* This deterrence rationale is inapposite in cases, like Perry's, in which the police engaged in no improper conduct.

*Coleman* v. *Alabama*, 399 U. S. 1 (1970), another decision in the *Stovall* line, similarly shows that the Court has linked the due process check, not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identi-

_____

[6] The Court's description of the question presented in *Brathwaite* assumes that improper state action occurred: "[Does] the Due Process Clause of the Fourteenth Amendment compe[l] the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary." 432 U. S., at 99.

fication. The defendants in *Coleman* contended that a witness' in-court identifications violated due process, because a pretrial stationhouse lineup was "so unduly prejudicial and conducive to irreparable misidentification as fatally to taint [the later identifications]." 399 U. S., at 3 (plurality opinion). The Court rejected this argument. *Id.,* at 5–6 (plurality opinion), 13–14 (Black, J., concurring), 22, n. 2 (Burger, C. J., dissenting), 28, n. 2 (Stewart, J., dissenting). No due process violation occurred, the plurality explained, because nothing "the police said or did prompted [the witness'] virtually spontaneous identification of [the defendants]." *Id.,* at 6. True, Coleman was the only person in the lineup wearing a hat, the plurality noted, but "nothing in the record show[ed] that he was required to do so." *Ibid.* See also *Colorado* v. *Connelly*, 479 U. S. 157, 163, 167 (1986) (Where the "crucial element of police overreaching" is missing, the admissibility of an allegedly unreliable confession is "a matter to be governed by the evidentiary laws of the forum, . . . and not by the Due Process Clause.").

Perry and the dissent place significant weight on *United States* v. *Wade*, 388 U. S. 218 (1967), describing it as a decision not anchored to improper police conduct. See Brief for Petitioner 12, 15, 21–22, 28; *post,* at 2–4, 8–10. In fact, the risk of police rigging was the very danger to which the Court responded in *Wade* when it recognized a defendant's right to counsel at postindictment, police-organized identification procedures. 388 U. S., at 233, 235–236. "[T]he confrontation *compelled by the State* between the accused and the victim or witnesses," the Court began, "is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Id.,* at 228 (emphasis added). "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification," the Court continued, "has been the degree of suggestion inher-

ent in the manner in which *the prosecution* presents the suspect to witnesses for pretrial identification." *Ibid.* (emphasis added). To illustrate the improper suggestion it was concerned about, the Court pointed to police-designed lineups where "all in the lineup but the suspect were known to the identifying witness, . . . the other participants in [the] lineup were grossly dissimilar in appearance to the suspect, . . . only the suspect was required to wear distinctive clothing which the culprit allegedly wore, . . . the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, . . . the suspect is pointed out before or during a lineup, . . . the participants in the lineup are asked to try on an article of clothing which fits only the suspect." *Id.,* at 233 (footnotes omitted). Beyond genuine debate, then, prevention of unfair police practices prompted the Court to extend a defendant's right to counsel to cover postindictment lineups and showups. *Id.,* at 235.

Perry's argument, reiterated by the dissent, thus lacks support in the case law he cites. Moreover, his position would open the door to judicial preview, under the banner of due process, of most, if not all, eyewitness identifications. External suggestion is hardly the only factor that casts doubt on the trustworthiness of an eyewitness' testimony. As one of Perry's *amici* points out, many other factors bear on "the likelihood of misidentification," *post,* at 9—for example, the passage of time between exposure to and identification of the defendant, whether the witness was under stress when he first encountered the suspect, how much time the witness had to observe the suspect, how far the witness was from the suspect, whether the suspect carried a weapon, and the race of the suspect and the witness. Brief for American Psychological Association as *Amicus Curiae* 9–12. There is no reason why an identification made by an eyewitness with poor vision, for ex-

ample, or one who harbors a grudge against the defendant, should be regarded as inherently more reliable, less of a "threat to the fairness of trial," *post,* at 14, than the identification Blandon made in this case. To embrace Perry's view would thus entail a vast enlargement of the reach of due process as a constraint on the admission of evidence.

Perry maintains that the Court can limit the due process check he proposes to identifications made under "suggestive circumstances." Tr. of Oral Arg. 11–14. Even if we could rationally distinguish suggestiveness from other factors bearing on the reliability of eyewitness evidence, Perry's limitation would still involve trial courts, routinely, in preliminary examinations. Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do. Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances. For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned "theft suspect," or hearing a radio report implicating the defendant in the crime. Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these circumstances might have "suggested" to the witness that the defendant was the person the witness observed committing the crime.

C

In urging a broadly applicable due process check on eyewitness identifications, Perry maintains that eyewitness identifications are a uniquely unreliable form of evidence. See Brief for Petitioner 17–22 (citing studies showing that eyewitness misidentifications are the leading cause of wrongful convictions); Brief for American Psychological Association as *Amicus Curiae* 14–17 (describing

research indicating that as many as one in three eyewitness identifications is inaccurate). See also *post,* at 14–17. We do not doubt either the importance or the fallibility of eyewitness identifications. Indeed, in recognizing that defendants have a constitutional right to counsel at postindictment police lineups, we observed that "the annals of criminal law are rife with instances of mistaken identification." *Wade*, 388 U. S., at 228.

We have concluded in other contexts, however, that the potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair. See, *e.g., Ventris*, 556 U. S., at 594, n. (declining to "craft a broa[d] exclusionary rule for uncorroborated statements obtained [from jailhouse snitches]," even though "rewarded informant testimony" may be inherently untrustworthy); *Dowling*, 493 U. S., at 353 (rejecting argument that the introduction of evidence concerning acquitted conduct is fundamentally unfair because such evidence is "inherently unreliable"). We reach a similar conclusion here: The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.

Our unwillingness to enlarge the domain of due process as Perry and the dissent urge rests, in large part, on our recognition that the jury, not the judge, traditionally determines the reliability of evidence. See *supra*, at 7. We also take account of other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability. These protections include the defendant's Sixth Amendment right to confront the eyewitness. See *Maryland* v. *Craig*, 497 U. S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant."). Another is the

defendant's right to the effective assistance of an attorney, who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments. Eyewitness-specific jury instructions, which many federal and state courts have adopted,[7] likewise warn the jury to take care in appraising identification evidence. See, *e.g., United States* v. *Telfaire*, 469 F. 2d 552, 558–559 (CADC 1972) *(per curiam)* (D. C. Circuit Model Jury Instructions) ("If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care."). See also *Ventris*, 556 U. S., at 594, n. (citing jury instructions that informed jurors about the unreliability of uncorroborated jailhouse-informant testimony as a reason to resist a ban on such testimony); *Dowling*, 493

---

[7] See Model Crim. Jury Instr. No. 4.15 (CA3 2009); *United States* v. *Holley*, 502 F. 2d 273, 277–278 (CA4 1974); Pattern Crim. Jury Instr. No. 1.29 (CA5 2001); Pattern Crim. Jury Instr. No. 7.11 (CA6 2011); Fed. Crim. Jury Instr. No. 3.08 (CA7 1999); Model Crim. Jury Instr. for the District Courts No. 4.08 (CA8 2011); Model Crim. Jury Instr. No. 4.11 (CA9 2010); Crim. Pattern Jury Instr. No. 1.29 (CA10 2011); Pattern Jury Instr. (Crim. Cases) Spec. Instr. No. 3 (CA11 2010); Rev. Ariz. Jury Instr., Crim., No. 39 (3d ed. 2008); 1 Judicial Council of Cal. Crim. Jury Instr. No. 315 (Summer 2011); Conn. Crim. Jury Instr. 2.6–4 (2007); 2 Ga. Suggested Pattern Jury Instr. (Crim. Cases) No. 1.35.10 (4th ed. 2011); Ill. Pattern Jury Instr., Crim., No. 3.15 (Supp. 2011); Pattern Instr., Kan. 3d, Crim., No. 52.20 (2011); 1 Md. Crim. Jury Instr. & Commentary §§2.56, 2.57(A), 2.57(B) (3d ed. 2009 and Supp. 2010); Mass. Crim. Model Jury Instr. No. 9.160 (2009); 10 Minn. Jury Instr. Guides, Crim., No. 3.19 (Supp. 2006); N. H. Crim. Jury Instr. No. 3.06 (1985); N. Y. Crim. Jury Instr. "Identification—One Witness" and "Identification—Witness Plus" (2d ed. 2011); Okla. Uniform Jury Instr., Crim., No. 9–19 (Supp. 2000); 1 Pa. Suggested Standard Crim. Jury Instr. No. 4.07B (2d ed. 2010); Tenn. Pattern Jury Instr., Crim., No. 42.05 (15th ed. 2011); Utah Model Jury Instr. CR404 (2d ed. 2010); Model Instructions from the Vt. Crim. Jury Instr. Comm. Nos. CR5–601, CR5–605 (2003); W. Va. Crim. Jury Instr. No. 5.05 (6th ed. 2003).

U. S., at 352–353.  The constitutional requirement that the government prove the defendant's guilt beyond a reasonable doubt also impedes convictions based on dubious identification evidence.

State and federal rules of evidence, moreover, permit trial judges to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury.  See, *e.g.,* Fed. Rule Evid. 403; N. H. Rule Evid. 403 (2011).  See also Tr. of Oral Arg. 19–22 (inquiring whether the standard Perry seeks differs materially from the one set out in Rule 403).  In appropriate cases, some States also permit defendants to present expert testimony on the hazards of eyewitness identification evidence.  See, *e.g., State* v. *Clopten*, 2009 UT 84, A33, 223 P. 3d 1103, 1113 ("We expect . . . that in cases involving eyewitness identification of strangers or near-strangers, trial courts will routinely admit expert testimony [on the dangers of such evidence].").

Many of the safeguards just noted were at work at Perry's trial.  During her opening statement, Perry's court-appointed attorney cautioned the jury about the vulnerability of Blandon's identification.  App. 115a (Blandon, "the eyewitness that the State needs you to believe[,] can't pick [Perry] out of a photo array.  How carefully did she really see what was going on? . . . How well could she really see him?").  While cross-examining Blandon and Officer Clay, Perry's attorney constantly brought up the weaknesses of Blandon's identification.  She highlighted: (1) the significant distance between Blandon's window and the parking lot, *id.,* at 226a; (2) the lateness of the hour, *id.,* at 225a; (3) the van that partly obstructed Blandon's view, *id.,* at 226a; (4) Blandon's concession that she was "so scared [she] really didn't pay attention" to what Perry was wearing, *id.,* at 233a; (5) Blandon's inability to describe Perry's facial features or other identifying marks, *id.,* at 205a, 233a–235a; (6) Blandon's failure to pick Perry

out of a photo array, *id.,* at 235a; and (7) Perry's position next to a uniformed, gun-bearing police officer at the moment Blandon made her identification, *id.,* at 202a–205a. Perry's counsel reminded the jury of these frailties during her summation. *Id.,* at 374a–375a (Blandon "wasn't able to tell you much about who she saw . . . . She couldn't pick [Perry] out of a lineup, out of a photo array . . . . [Blandon said] [t]hat guy that was with the police officer, that's who was circling. Again, think about the context with the guns, the uniforms. Powerful, powerful context clues.").

After closing arguments, the trial court read the jury a lengthy instruction on identification testimony and the factors the jury should consider when evaluating it. *Id.,* at 399a–401a. The court also instructed the jury that the defendant's guilt must be proved beyond a reasonable doubt, *id.,* at 390a, 392a, 395a–396a, and specifically cautioned that "one of the things the State must prove [beyond a reasonable doubt] is the identification of the defendant as the person who committed the offense," *id.,* at 398a–399a.

Given the safeguards generally applicable in criminal trials, protections availed of by the defense in Perry's case, we hold that the introduction of Blandon's eyewitness testimony, without a preliminary judicial assessment of its reliability, did not render Perry's trial fundamentally unfair.

\*     \*     \*

For the foregoing reasons, we agree with the New Hampshire courts' appraisal of our decisions. See *supra,* at 4–5. Finding no convincing reason to alter our precedent, we hold that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circum-

stances arranged by law enforcement. Accordingly, the judgment of the New Hampshire Supreme Court is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–8974

_____

## BARION PERRY, PETITIONER *v.* NEW HAMPSHIRE

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEW HAMPSHIRE

[January 11, 2012]

JUSTICE THOMAS, concurring.

The Court correctly concludes that its precedents establish a due process right to the pretrial exclusion of an unreliable eyewitness identification only if the identification results from police suggestion. I therefore join its opinion. I write separately because I would not extend *Stovall* v. *Denno,* 388 U. S. 293 (1967), and its progeny even if the reasoning of those opinions applied to this case. The *Stovall* line of cases is premised on a "substantive due process" right to "fundamental fairness." See, *e.g., id.,* at 299 (concluding that whether a suggestive identification "resulted in such unfairness that it infringed [the defendant's] right to due process of law" is "open to all persons to allege and prove"); *Manson* v. *Brathwaite,* 432 U. S. 98, 113 (1977) ("The standard, after all, is that of fairness as required by the Due Process Clause of the Fourteenth Amendment"). In my view, those cases are wrongly decided because the Fourteenth Amendment's Due Process Clause is not a "secret repository of substantive guarantees against 'unfairness.'" *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 598–599 (1996) (SCALIA, J., joined by THOMAS, J., dissenting); see also *McDonald* v. *Chicago,* 561 U. S. \_\_\_, \_\_\_ (2010) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 7) ("The notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property

could define the substance of those rights strains credulity"). Accordingly, I would limit the Court's suggestive eyewitness identification cases to the precise circumstances that they involved.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–8974

_____

## BARION PERRY, PETITIONER *v.* NEW HAMPSHIRE

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEW HAMPSHIRE

[January 11, 2012]

JUSTICE SOTOMAYOR, dissenting.

This Court has long recognized that eyewitness identifi-
cations' unique confluence of features—their unreliability,
susceptibility to suggestion, powerful impact on the jury,
and resistance to the ordinary tests of the adversarial
process—can undermine the fairness of a trial. Our cases
thus establish a clear rule: The admission at trial of
out-of-court eyewitness identifications derived from imper-
missibly suggestive circumstances that pose a very substan-
tial likelihood of misidentification violates due process.
The Court today announces that that rule does not even
"com[e] into play" unless the suggestive circumstances are
improperly "police-arranged." *Ante*, at 2, 11.

Our due process concern, however, arises not from the
act of suggestion, but rather from the corrosive effects of
suggestion on the reliability of the resulting identification.
By rendering protection contingent on improper police
arrangement of the suggestive circumstances, the Court
effectively grafts a *mens rea* inquiry onto our rule. The
Court's holding enshrines a murky distinction—between
suggestive confrontations intentionally orchestrated by
the police and, as here, those inadvertently caused by
police actions—that will sow confusion. It ignores our
precedents' acute sensitivity to the hazards of intentional
and unintentional suggestion alike and unmoors our rule
from the very interest it protects, inviting arbitrary re-

sults. And it recasts the driving force of our decisions as an interest in police deterrence, rather than reliability. Because I see no warrant for declining to assess the circumstances of this case under our ordinary approach, I respectfully dissent.[1]

## I

The "driving force" behind *United States* v. *Wade*, 388 U. S. 218 (1967), *Gilbert* v. *California*, 388 U. S. 263 (1967), and *Stovall* v. *Denno*, 388 U. S. 293 (1967), was "the Court's concern with the problems of eyewitness identification"—specifically, "the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability." *Manson* v. *Brathwaite*, 432 U. S. 98, 111–112 (1977). We have pointed to the "'formidable'" number of "miscarriage[s] of justice from mistaken identification" in the annals of criminal law. *Wade*, 388 U. S., at 228. We have warned of the "vagaries" and "'proverbially untrustworthy'" nature of eyewitness identifications. *Ibid.* And we have singled out a "major factor contributing" to that proverbial unreliability: "the suggestibility inherent in the context of the pretrial identification." *Id.,* at 228, 235.

Our precedents make no distinction between intentional and unintentional suggestion. To the contrary, they explicitly state that "[s]uggestion can be created intentionally or unintentionally in many subtle ways." *Id.*, at 229. Rather than equate suggestive conduct with misconduct, we specifically have disavowed the assumption that suggestive influences may only be "the result of police procedures intentionally designed to prejudice an accused." *Id.*, at 235; see also *id.*, at 236 (noting "grave potential for prejudice, intentional or not, in the pretrial lineup"); *id.,* at

---

[1] Because the facts of this case involve police action, I do not reach the question whether due process is triggered in situations involving no police action whatsoever.

239 (describing lack of lineup regulations addressing "risks of abuse and unintentional suggestion"). "Persons who conduct the identification procedure may suggest, intentionally or unintentionally, that they expect the witness to identify the accused." *Moore* v. *Illinois*, 434 U. S. 220, 224 (1977). The implication is that even police acting with the best of intentions can inadvertently signal "'that's the man.'" *Wade*, 388 U. S., at 236; see also *Kirby* v. *Illinois*, 406 U. S. 682, 690–691 (1972) ("[I]t is always necessary to 'scrutinize *any* pretrial confrontation . . .'").[2]

In *Wade* itself, we noted that the "potential for improper influence [in pretrial confrontations] is illustrated by the circumstances . . . [i]n the present case." 388 U. S., at 233–234. We then highlighted not the lineup procedure, but rather a preprocedure encounter: The two witnesses who later identified Wade in the lineup had seen Wade outside while "await[ing] assembly of the lineup." *Id.,* at 234. Wade had been standing in the hallway, which happened to be "observable to the witnesses through an open door." *Ibid.* One witness saw Wade "within sight of an FBI agent"; the other saw him "in the custody of the agent." *Ibid.* In underscoring the hazards of these circumstances, we made no mention of whether the encounter had been arranged; indeed, the facts suggest that it was not.

More generally, our precedents focus not on the act of suggestion, but on suggestion's "corrupting effect" on

---

[2] *Wade* held that the dangers of pretrial identification procedures necessitated a right to counsel; that same day, *Stovall* held that a defendant ineligible for the *Wade* rule was still entitled to challenge the confrontation as a due process violation. Because the two were companion cases advancing interrelated rules to avoid unfairness at trial resulting from suggestive pretrial confrontations, *Wade*'s exposition of the dangers of suggestiveness informs both contexts. See *Manson* v. *Brathwaite*, 432 U. S. 98, 112 (1977) ("*Wade* and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability").

reliability.  *Brathwaite*, 432 U. S., at 114.  Eyewitness evidence derived from suggestive circumstances, we have explained, is uniquely resistant to the ordinary tests of the adversary process.  An eyewitness who has made an identification often becomes convinced of its accuracy.  "*Regardless of how the initial misidentification comes about*, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent . . . courtroom identification."  *Simmons* v. *United States*, 390 U. S. 377, 383–384 (1968) (emphasis added); see also *Wade*, 388 U. S., at 229 (witness is "not likely" to recant).  Suggestion bolsters that confidence.

At trial, an eyewitness' artificially inflated confidence in an identification's accuracy complicates the jury's task of assessing witness credibility and reliability.  It also impairs the defendant's ability to attack the eyewitness' credibility.  *Stovall*, 388 U. S., at 298.  That in turn jeopardizes the defendant's basic right to subject his accuser to meaningful cross-examination.  See *Wade*, 388 U. S., at 235 ("[C]ross-examination . . . cannot be viewed as an absolute assurance of accuracy and reliability . . . where so many variables and pitfalls exist").  The end result of suggestion, whether intentional or unintentional, is to fortify testimony bearing directly on guilt that juries find extremely convincing and are hesitant to discredit.  See *id.*, at 224 ("[A]t pretrial proceedings . . . the results might well settle the accused's fate and reduce the trial itself to a mere formality"); *Gilbert*, 388 U. S., at 273 ("[T]he witness' testimony of his lineup identification will enhance the impact of his in-court identification on the jury").

Consistent with our focus on reliability, we have declined to adopt a *per se* rule excluding all suggestive identifications.  Instead, "reliability is the linchpin" in deciding admissibility.  *Brathwaite*, 432 U. S., at 114.  We have explained that a suggestive identification procedure "does

not in itself intrude upon a constitutionally protected interest." *Id.*, at 113, n. 13; see also *Neil* v. *Biggers*, 409 U. S. 188, 198–199 (1972) (rejecting the proposition that "unnecessary suggestiveness alone requires the exclusion of evidence"). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification"—and "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Id.*, at 198; see also *United States ex rel. Kirby* v. *Sturges*, 510 F. 2d 397, 406 (CA7 1975) (Stevens, J.) ("The due process clause applies only to proceedings which result in a deprivation of life, liberty or property. . . . [I]f a constitutional violation results from a showup, it occurs in the courtroom, not in the police station"). In short, "'what the *Stovall* due process right protects is an evidentiary interest.'" *Brathwaite*, 432 U. S., at 113, n. 14.

To protect that evidentiary interest, we have applied a two-step inquiry: First, the defendant has the burden of showing that the eyewitness identification was derived through "impermissibly suggestive" means.[3] *Simmons*, 390 U. S., at 384. Second, if the defendant meets that burden, courts consider whether the identification was

—————

[3] Our precedents refer to "impermissibly," "unnecessarily," and "unduly" suggestive circumstances interchangeably. See, *e.g., Brathwaite*, 432 U. S., at 105, n. 8, 107–108, 110, 112–113 ("impermissibly" and "unnecessarily"); *Neil* v. *Biggers*, 409 U. S. 188, 196–199 (1972) ("impermissibly" and "unnecessarily"); *Coleman* v. *Alabama*, 399 U. S. 1, 3–5 (1970) ("unduly" and "impermissibly"); *Simmons* v. *United States*, 390 U. S. 377, 383–384 (1968) ("unduly" and "impermissibly"). The Circuits have followed suit. *E.g., Thigpen* v. *Cory*, 804 F. 2d 893, 895 (CA6 1986) ("unduly"); *Green* v. *Loggins*, 614 F. 2d 219, 223 (CA9 1980) ("unnecessarily or impermissibly"). All reinforce our focus not on the act of suggestion, but on whether the suggestiveness rises to such a level that it undermines reliability. Police machinations can heighten the likelihood of misidentification, but they are no prerequisite to finding a confrontation "so impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification." *Simmons*, 390 U. S., at 384.

reliable under the totality of the circumstances. That step entails considering the witness' opportunity to view the perpetrator, degree of attention, accuracy of description, level of certainty, and the time between the crime and pretrial confrontation, then weighing such factors against the "corrupting effect of the suggestive identification." *Brathwaite*, 432 U. S., at 108, 114. Most identifications will be admissible. The standard of "fairness as required by the Due Process Clause," *id.,* at 113, however, demands that a subset of the most unreliable identifications—those carrying a "'very substantial likelihood of . . . misidentification'"—will be excluded. *Biggers*, 409 U. S., at 198.

## II
### A

The majority today creates a novel and significant limitation on our longstanding rule: Eyewitness identifications so impermissibly suggestive that they pose a very substantial likelihood of an unreliable identification will be deemed inadmissible at trial *only* if the suggestive circumstances were "police-arranged." *Ante*, at 2. Absent "improper police arrangement," "improper police conduct," or "rigging," the majority holds, our two-step inquiry does not even "com[e] into play." *Ante*, at 2, 11. I cannot agree.

The majority does not simply hold that an eyewitness identification must be the product of police action to trigger our ordinary two-step inquiry. Rather, the majority maintains that the suggestive circumstances giving rise to the identification must be "police-arranged," "police rigg[ed]," "police-designed," or "police-organized." *Ante,* at 2, 12–13. Those terms connote a degree of intentional orchestration or manipulation. See Brief for Respondent 19 (no indication that police "deliberately tried to manipulate any evidence"); Brief for United States as *Amicus Curiae* 18 ("[N]o one deliberately arranged the circumstances to obtain an identification"). The majority cate-

gorically exempts all eyewitness identifications derived from suggestive circumstances that were not police-manipulated—however suggestive, and however unreliable—from our due process check. The majority thus appears to graft a *mens rea* requirement onto our existing rule.[4]

As this case illustrates, police intent is now paramount. As the Court acknowledges, Perry alleges an *"accidental* showup." Brief for Petitioner 34 (emphasis added); see *ante,* at 4. He was the only African-American at the scene of the crime standing next to a police officer. For the majority, the fact that the police did not intend that showup, even if they inadvertently caused it in the course of a police procedure, ends the inquiry. The police were questioning the eyewitness, Blandon, about the perpetrator's identity, and were intentionally detaining Perry in the parking lot—but had not intended for Blandon to identify the perpetrator from her window. Presumably, in the majority's view, had the police asked Blandon to move to the window to identify the perpetrator, that could have made all the difference. See Tr. of Oral Arg. 32, 37.

I note, however, that the majority leaves what is required by its arrangement-focused inquiry less than clear. In parts, the opinion suggests that the police must arrange an identification "procedure," regardless of whether they "inten[d] the arranged procedure to be suggestive." *Ante*, at 2, n. 1; see also *ante,* at 7–8. Elsewhere, it indicates that the police must arrange the "suggestive circumstances" that lead the witness to identify the accused. See

_____

[4] The majority denies that it has imposed a *mens rea* requirement, see *ante,* at 2, n. 1, but by confining our due process concerns to police-arranged identification procedures, that is just what it has done. The majority acknowledges that "whether or not [the police] intended the arranged procedure to be suggestive" is irrelevant under our precedents, *ibid.,* but still places dispositive weight on whether or not the police intended the procedure itself.

*ante,* at 1–2, 10–11, 18–19. Still elsewhere it refers to "improper" police conduct, *ante,* at 1–2, 9–12, connoting bad faith. Does police "arrangement" relate to the procedure, the suggestiveness, or both? If it relates to the procedure, do suggestive preprocedure encounters no longer raise the same concerns? If the police need not "inten[d] the arranged procedure to be suggestive," *ante,* at 2, n. 1, what makes the police action "improper"? And does that mean that good-faith, unintentional police suggestiveness in a police-arranged lineup can be "impermissibly suggestive"? If no, the majority runs headlong into *Wade.* If yes, on what basis—if not deterrence—does it distinguish unintentional police suggestiveness in an accidental confrontation?

The arrangement-focused inquiry will sow needless confusion. If the police had called Perry and Blandon to the police station for interviews, and Blandon saw Perry being questioned, would that be sufficiently "improper police arrangement"? If Perry had voluntarily come to the police station, would that change the result? Today's opinion renders the applicability of our ordinary inquiry contingent on a murky line-drawing exercise. Whereas our two-step inquiry focuses on overall reliability—and could account for the spontaneity of the witness' identification and degree of police manipulation under the totality of the circumstances—today's opinion forecloses that assessment by establishing a new and inflexible step zero.

### B

The majority regards its limitation on our two-step rule as compelled by precedent. Its chief rationale, *ante*, at 7–13, is that none of our prior cases involved situations where the police "did not arrange the suggestive circumstances." *Ante,* at 10; see also *ante,* at 2, n. 1. That is not necessarily true, given the seemingly unintentional encounter highlighted in *Wade.* But even if it were true, it is

unsurprising. The vast majority of eyewitness identifications that the State uses in criminal prosecutions are obtained in lineup, showup, and photograph displays arranged by the police. Our precedents reflect that practical reality.

It is also beside the point. Our due process concerns were not predicated on the source of suggestiveness. Rather, "[i]t is the likelihood of misidentification which violates a defendant's right to due process," *Biggers*, 409 U. S., at 198, and we are concerned with suggestion insofar as it has "corrupting effect[s]" on the identification's reliability. *Brathwaite*, 432 U. S., at 114. Accordingly, whether the police have created the suggestive circumstances intentionally or inadvertently, the resulting identification raises the same due process concerns. It is no more or less likely to misidentify the perpetrator. It is no more or less powerful to the jury. And the defendant is no more or less equipped to challenge the identification through cross-examination or prejudiced at trial. The arrangement-focused inquiry thus untethers our doctrine from the very "'evidentiary interest'" it was designed to protect, inviting arbitrary results. *Id.*, at 113, n. 14.

Indeed, it is the majority's approach that lies in tension with our precedents. Whereas we previously disclaimed the crabbed view of suggestiveness as "the result of police procedures intentionally designed to prejudice an accused," *Wade*, 388 U. S., at 235, the majority's focus on police rigging and improper conduct will revive it. Whereas our precedents were sensitive to intentional and unintentional suggestiveness alike, see *supra*, at 2–3, today's decision narrows our concern to intentionally orchestrated suggestive confrontations. We once described the "primary evil to be avoided" as the likelihood of misidentification. *Biggers*, 409 U. S., at 198. Today's decision, however, means that even if that primary evil is at its apex, we need not avoid it at all so long as the suggestive circum-

stances do not stem from improper police arrangement.

## C

The majority gives several additional reasons for why applying our due process rule beyond improperly police-arranged circumstances is unwarranted. In my view, none withstands close inspection.

First, the majority insists that our precedents "aim to deter police from rigging identification procedures," so our rule should be limited to applications that advance that "primary aim" and "key premise." *Ante*, at 2, 11 (citing *Brathwaite*, 432 U. S., at 112). That mischaracterizes our cases. We discussed deterrence in *Brathwaite* because Brathwaite challenged our two-step inquiry as *lacking* deterrence value. Brathwaite argued that deterrence demanded a *per se* rule excluding all suggestive identifications. He said that our rule, which probes the reliability of suggestive identifications under the totality of the circumstances, "cannot be expected to have a significant deterrent impact." *Id.,* at 111.

We rebutted Brathwaite's criticism in language the majority now wrenches from context: Upon summarizing Brathwaite's argument, we acknowledged "several interests to be considered." *Ibid.* We then compared the two rules under each interest: First, we noted the "driving force" behind *Wade* and its companion cases—"the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability"—and found both approaches "responsive to this concern," but the *per se* rule to go "too far" in suppressing reliable evidence. 432 U. S., at 111–112. We noted a "second factor"—deterrence—conceding that the *per se* rule had "more significant deterrent effect," but noting that our rule "also has an influence on police behavior." *Id.*, at 112. Finally, we noted a "third factor"—"the effect on the administration of justice"—describing the *per se* rule as having serious drawbacks on

this front. *Ibid.* That was no list of "primary aim[s]." Nor was it a ringing endorsement of the primacy of deterrence. We simply underscored, in responding to Brathwaite, that our rule was not without deterrence benefits. To the contrary, we clarified that deterrence was a subsidiary concern to reliability, the "driving force" of our doctrine. It is a stretch to claim that our rule cannot apply wherever "[t]his deterrence rationale is inapposite." *Ante*, at 11.

Second, the majority states that *Coleman* v. *Alabama*, 399 U. S. 1 (1970), held that "[n]o due process violation occurred . . . because nothing 'the police said or did prompted'" the identification and shows that our rule is linked "only to improper police arrangement." *Ante*, at 11–12. That misreads the decision. In *Coleman*, the petitioners challenged a witness' in-court identification of them at trial on grounds that it had been tainted by a suggestive pretrial lineup. We held that no due process violation occurred because the in-court identification appeared to be "entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup," and thus could not be said to stem from an identification procedure "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" 399 U. S.*,* at 5–6 (plurality opinion). We then dismissed each of the asserted suggestive influences as having had no bearing on the identification at all: The petitioners claimed that the police intimated to the witness that his attackers were in the lineup; we found the record "devoid of evidence that anything the police said or did" induced the identification. *Id.,* at 6. The petitioners claimed that they alone were made to say certain words; we found that the witness identified petitioners before either said anything. One petitioner claimed he was singled out to wear a hat; we found that the witness' identification "d[id] not appear . . . based on the fact that he remembered that [the attacker] had worn a hat." *Ibid.*

Thus, far from indicating that improper police conduct is a prerequisite, *Coleman* merely held that there had been no influence on the witness. In fact, in concluding that the lineup was not "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification,'" *Coleman* indicates that the two-step inquiry is not truncated at the threshold by the absence of police misconduct.

Third, the majority emphasizes that we should rely on the jury to determine the reliability of evidence. See *ante,* at 15–16. But our cases are rooted in the assumption that eyewitness identifications upend the ordinary expectation that it is "the province of the jury to weigh the credibility of competing witnesses." *Kansas* v. *Ventris*, 556 U. S. 586, 594, n. (2009). As noted, jurors find eyewitness evidence unusually powerful and their ability to assess credibility is hindered by a witness' false confidence in the accuracy of his or her identification. That disability in no way depends on the intent behind the suggestive circumstances.

The majority's appeals to protecting the jury's domain, moreover, appeared in dissent after dissent from our decisions. See *Foster* v. *California*, 394 U. S. 440, 447 (1969) (Black, J., dissenting) ("[T]he jury is the sole tribunal to weigh and determine facts" and "must . . . be allowed to hear eyewitnesses and decide for itself whether it can recognize the truth"); *Simmons*, 390 U. S., at 395 (Black, J., concurring in part and dissenting in part) ("The weight of the evidence . . . is not a question for the Court but for the jury"). So too does the majority's assurance that other constitutional protections like the Sixth Amendment rights to compulsory process and confrontation can suffice to expose unreliable identifications. Compare *ante*, at 6, with *Foster*, 394 U. S., at 448–449 (Black, J., dissenting) ("The Constitution sets up its own standards of unfairness in criminal trials," including the Sixth Amendment "right to compulsory process" and "right to

confront . . . witnesses"). So too does the majority's appeal to leave reliability to the rules of evidence. Compare *ante*, at 17, with *Foster*, 394 U. S., at 448 (Black, J., dissenting) ("'Rules of evidence are designed in the interests of fair trials'"), and *Stovall*, 388 U. S., at 306 (Black, J., dissenting) ("[T]he result . . . is to put into a constitutional mould a rule of evidence"). Those arguments did not prevail then; they should not prevail here.

Fourth, the majority suggests that applying our rule beyond police-arranged suggestive circumstances would entail a heavy practical burden, requiring courts to engage in "preliminary judicial inquiry" into "most, if not all, eyewitness identifications." *Ante*, at 13, 18. But that is inaccurate. The burden of showing "impermissibly suggestive" circumstances is the defendant's, so the objection falls to the defendant to raise. And as is implicit in the majority's reassurance that Perry may resort to the rules of evidence in lieu of our due process precedents, trial courts will be entertaining defendants' objections, pretrial or at trial, to unreliable eyewitness evidence in any event. The relevant question, then, is what the standard of admissibility governing such objections should be. I see no reason to water down the standard for an equally suggestive and unreliable identification simply because the suggestive confrontation was unplanned.

It bears reminding, moreover, that we set a high bar for suppression. The vast majority of eyewitnesses proceed to testify before a jury. To date, *Foster* is the only case in which we have found a due process violation. 394 U. S., at 443. There has been no flood of claims in the four Federal Circuits that, having seen no basis for an arrangement-based distinction in our precedents, have long indicated that due process scrutiny applies to all suggestive identification procedures. See *Dunnigan* v. *Keane*, 137 F. 3d 117, 128 (CA2 1998); *United States* v. *Bouthot*, 878 F. 2d 1506, 1516 (CA1 1989); *Thigpen* v. *Cory*, 804 F. 2d 893, 895 (CA6

1986); see also *Green* v. *Loggins*, 614 F. 2d 219, 223 (CA9 1980). Today's decision nonetheless precludes even the possibility that an unintended confrontation will meet that bar, mandating summary dismissal of every such claim at the threshold.

Finally, the majority questions how to "rationally distinguish suggestiveness from other factors bearing on the reliability of eyewitness evidence," such as "poor vision" or a prior "grudge," *ante*, at 13–14, and more broadly, how to distinguish eyewitness evidence from other kinds of arguably unreliable evidence. *Ante,* at 14–15. Our precedents, however, did just that. We emphasized the "'formidable number of instances in the records of English and American trials'" of "miscarriage[s] of justice from mistaken identification." *Wade*, 388 U. S., at 228. We then observed that "'the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor.'" *Id.*, at 229. Moreover, the majority points to no other type of evidence that shares the rare confluence of characteristics that makes eyewitness evidence a unique threat to the fairness of trial. Jailhouse informants, cf. *ante,* at 15, unreliable as they may be, are not similarly resistant to the traditional tools of the adversarial process and, if anything, are met with particular skepticism by juries.

It would be one thing if the passage of time had cast doubt on the empirical premises of our precedents. But just the opposite has happened. A vast body of scientific literature has reinforced every concern our precedents articulated nearly a half-century ago, though it merits barely a parenthetical mention in the majority opinion. *Ante*, at 14. Over the past three decades, more than two thousand studies related to eyewitness identification have been published. One state supreme court recently appointed a special master to conduct an exhaustive survey of the current state of the scientific evidence and conclud-

ed that "[t]he research . . . is not only extensive," but "it represents the 'gold standard in terms of the applicability of social science research to law.'" *State* v. *Henderson,* 208 N. J. 208, 283, 27 A. 3d 872, 916 (2011). "Experimental methods and findings have been tested and retested, subjected to scientific scrutiny through peer-reviewed journals, evaluated through the lens of meta-analyses, and replicated at times in real-world settings." *Ibid.;* see also Schmechel, O'Toole, Easterly, & Loftus, Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence, 46 Jurimetrics 177, 180 (2006) (noting "nearly unanimous consensus among researchers about the [eyewitness reliability] field's core findings").

The empirical evidence demonstrates that eyewitness misidentification is "'the single greatest cause of wrongful convictions in this country.'"[5] Researchers have found that a staggering 76% of the first 250 convictions overturned due to DNA evidence since 1989 involved eyewitness misidentification.[6] Study after study demonstrates

——————

[5] *State* v. *Henderson,* 208 N. J. 208, 231, 27 A. 3d 872, 885 (2011); see also, *e.g., Benn* v. *United States*, 978 A. 2d 1257, 1266 (D. C. 2009); *State* v. *Dubose*, 285 Wis. 2d 143, 162, 699 N. W. 2d 582, 592 (2005); Dept. of Justice, Office of Justice Programs, E. Connors, T. Lundregan, N. Miller, & T. McEwen, Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial 24 (1996); B. Cutler & S. Penrod, Mistaken Identification: The Eyewitness, Psychology, and the Law 8 (1995); Wells, "Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts their Reports of the Witnessing Experience, 83 J. of Applied Psychology No. 3 360 (1998).

[6] B. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong 9, 48, 279 (2011); see also, *e.g.,* Innocence Project, Facts on Post-Conviction DNA Exonerations (75% of postconviction DNA exoneration cases in the U. S. involved eyewitness misidentification), http:// www.innocenceproject.org/Content/Facts_on_PostConviction_DNA_ Exonerations.php (as visited Jan. 11, 2012, and available in Clerk of Court's case file); Dept. of Justice, National Institute of Justice, Eyewitness Evidence: A Guide for Law Enforcement iii (1999) (85% of 28

that eyewitness recollections are highly susceptible to distortion by postevent information or social cues;[7] that jurors routinely overestimate the accuracy of eyewitness identifications;[8] that jurors place the greatest weight on eyewitness confidence in assessing identifications[9] even though confidence is a poor gauge of accuracy;[10] and that suggestiveness can stem from sources beyond police-orchestrated procedures.[11]    The majority today nevertheless adopts an artificially narrow conception of the dangers of suggestive identifications at a time when our concerns should have deepened.

### III

There are many reasons why Perry's particular situation might not violate due process.  The trial court found

———————

felony convictions overturned on DNA evidence involved eyewitness misidentification).

[7] See, *e.g.,* Gabbert, Memon, Allan, & Wright, Say it to My Face: Examining the Effects of Socially Encountered Misinformation, 9 Legal & Criminological Psychol. 215 (2004); Douglass & Steblay, Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect, 20 Applied Cognitive Psychol. 859, 864–865 (2006).

[8] See Brigham & Bothwell, The Ability of Prospective Jurors to Estimate the Accuracy of Eyewitness Identifications, 7 Law & Hum. Behav. 19, 22–24, 28 (1983) (nearly 84% of study respondents overestimated accuracy rates of identifications); see also, *e.g.,* Sigler & Couch, Eyewitness Testimony and the Jury Verdict, 4 N. Am. J. Psychol. 143, 146 (2002).

[9] See Cutler & Penrod, Mistaken Identification, at 181–209; Lindsay, Wells, & Rumpel, Can People Detect Eyewitness-Identification Accuracy Within and Across Situations? 66 J. Applied Psychol. 79, 83 (1981).

[10] See Brewer, Feast, & Rishworth, The Confidence-Accuracy Relationship in Eyewitness Identification, 8 J. Experimental Psychol. Applied 44, 44–45 (2002) ("average confidence-accuracy correlations generally estimated between little more than 0 and .29"); see also*, e.g.,* Sporer, Penrod, Read, & Cutler, Choosing, Confidence, and Accuracy: A Meta-Analysis of the Confidence-Accuracy Relation in Eyewitness Identification Studies, 118 Psychol. Bull. 315 (1995).

[11] See Brief for Wilton Dedge et al. as *Amici Curiae* 8, n. 13.

that the circumstances surrounding Blandon's identification did not rise to an impermissibly suggestive level. It is not at all clear, moreover, that there was a very substantial likelihood of misidentification, given Blandon's lack of equivocation on the scene, the short time between crime and confrontation, and the "fairly well lit" parking lot. App. 56. The New Hampshire Supreme Court, however, never made findings on either point and, under the majority's decision today, never will.

\*          \*          \*

The Court's opinion today renders the defendant's due process protection contingent on whether the suggestive circumstances giving rise to the eyewitness identification stem from improper police arrangement. That view lies in tension with our precedents' more holistic conception of the dangers of suggestion and is untethered from the evidentiary interest the due process right protects. In my view, the ordinary two-step inquiry should apply, whether the police created the suggestive circumstances intentionally or inadvertently. Because the New Hampshire Supreme Court truncated its inquiry at the threshold, I would vacate the judgment and remand for a proper analysis. I respectfully dissent.