FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD DELMER BOYER,
*Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden,
*Respondent-Appellee.*

No. 13-99006

D.C. No.
2:06-cv-07584-GAF

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
May 14, 2015—San Francisco, California

Filed July 16, 2015

Before: Diarmuid F. O'Scannlain, Sandra S. Ikuta,
and N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of Richard Delmer Boyer's habeas corpus petition challenging his two first degree murder convictions and death sentence.

The panel held that the state court did not unreasonably apply clearly established Supreme Court precedent when it determined that federal law did not require the trial court to conduct a live evidentiary hearing to assess the reliability of testimony that the prosecution introduced at the penalty phase in order to prove that Boyer had committed a prior murder. Regarding Boyer's sufficiency of the evidence challenge to the prior murder, in connection with which Boyer pointed to problems with the eyewitness identification, the panel held that fairminded jurists could disagree on the correctness of the state court's decision that the evidence that Boyer committed the murder was sufficient.

Regarding Boyer's claim that trial counsel deficiently failed to investigate the possibility that Boyer suffered from organic brain damage at the guilt phase of the trial, the panel held that it was not unreasonable for the state court to conclude that Boyer's counsel conducted a thorough investigation into his mental state and that such investigation satisfied the performance prong of *Strickland v. Washington*. The panel also held that Boyer failed to demonstrate the requisite prejudice. The panel held that the district court did

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not err when it denied for largely the same reasons Boyer's claim that trial counsel deficiently failed to investigate the possibility that he suffered from organic brain damage at the penalty phase.

The panel rejected as foreclosed by precedent Boyer's contentions that the California death penalty is unconstitutional by virtue of (1) the statutory scheme's failure to narrow adequately the class of eligible defendants and (2) prosecutorial discretion.

The panel declined to certify two claims relating to the admission of testimony given pursuant to an agreement that the testimony would be consistent with prior statements to the police.

Certifying three previously-uncertified claims, the panel held that Boyer is not entitled to relief on his contentions that the trial court erred when it sua sponte failed to instruct the jury that unconsciousness is a complete defense and failed to define unconsciousness, and that trial counsel provided ineffective assistance for failure to request such instructions.

**COUNSEL**

Lise S. Jacobson, Deputy Attorney General for the State of California, San Diego, California, argued the cause for the appellee the State of California. Kamala D. Harris, Attorney General of California, filed the briefs for the appellee. With her on the briefs were Julie L. Garland, Senior Assistant Attorney General, and Robin Urbanski, Deputy Attorney General, San Diego, California.

Joel Levine, Costa Mesa, California, and R. Clayton Seaman, Prescott, Arizona, argued the cause on behalf of the petitioner-appellant Richard Delmer Boyer and filed briefs.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the California Supreme Court violated the United States Constitution in affirming a habeas petitioner's two first degree murder convictions and his death sentence.

I

A California state court jury convicted Richard Delmer Boyer of the double murder of an elderly couple, Francis and Aileen Harbitz. After a separate penalty proceeding, the jury returned a sentence of death.[1]

---

[1] Boyer was tried three times for the Harbitzes' murders. The first trial ended when, after deliberating for 8 days, the jury failed to reach a verdict. A second jury convicted Boyer of murdering the Harbitzes, but the

A

1

At the guilt phase of trial, the prosecution showed that the Harbitzes had been stabbed to death in their Fullerton, California home on December 7, 1982. When their son William Harbitz entered the home five days later, he discovered his father's body sitting upright against a bloody wall in the hallway and his mother's body covered in blood on the living room floor. Francis had sustained approximately 24 stab wounds to the neck, chest, and back, and bled to death because of knife wounds to the heart and aorta. Aileen had suffered 19 stab wounds and likewise bled to death as a result of her injuries. The Harbitzes' residence did not show signs of forced entry nor had it been ransacked, and there was approximately $400 worth of cash in the home when the bodies were discovered.

After discovering his parents' bodies, William mentioned Boyer's name to police. William had introduced Boyer to his parents, and Boyer had done odd jobs for the Harbitzes and borrowed money from them on occasion. William had come to know Boyer because they had previously lived in the same apartment complex.

---

California Supreme Court reversed that conviction, concluding that police officers violated Boyer's constitutional rights during questioning that led to a confession. The Court determined, however, that the illegal confession had not tainted the physical evidence, and reversed and remanded for a new trial. The third trial, held in 1992, is the one at issue here.

When police subsequently searched the residence that Boyer maintained with his girlfriend, Cynthia Cornwell, officers found a pair of Levi's jeans stained with blood consistent with Boyer's and blood consistent with that of both Francis and Aileen Harbitz. Officers also recovered a buck knife, capable of inflicting the Harbitzes' wounds and stained with human blood, as well as the charred remains of a jacket burned in a hibachi grill.

John Kennedy, a key prosecution witness, testified under a grant of immunity that he had arrived at Boyer's residence between 4:30 and 5:00 p.m. on the afternoon of December 7, and that Boyer asked for a ride to his father's house to pick up some money. Along the way, Kennedy and Boyer stopped to buy cocaine from a dealer Kennedy knew, using $25 Kennedy had borrowed from his brother. They then proceeded to the home of Boyer's father, where Boyer spent approximately 15 minutes inside.

Kennedy and Boyer then drove to an apartment complex and attempted to buy marijuana, but failed. Boyer then directed Kennedy to another apartment complex to find "Bill." The pair failed to locate Bill, and Boyer speculated that Bill had moved back in with his parents. Boyer then directed Kennedy to "some dope dealer's house," which Boyer later revealed to be "Bill's parents' house"—that is, the Harbitzes' residence. Bill, of course, was William Harbitz.

Kennedy testified that Boyer entered the Harbitzes' home acting normally and remained inside for about 45 minutes. He returned, again acting normally, with a towel in hand. When a police patrol vehicle approached, Boyer began wiping the vehicle's rear window with the towel and shortly thereafter

admonished Kennedy to "take off calmly, not to attract any attention."

As they drove away, Kennedy observed Boyer apply the towel to his left knee. Boyer told Kennedy that he had to hurt someone because they didn't "have no dope" and indicated that he had been stabbed himself. Soon after, Kennedy saw Boyer going through two wallets. Boyer threw one of the wallets out a window near an off ramp and put the other down a gutter. When the pair returned to Boyer's residence, Kennedy observed a stab wound to Boyer's knee. He also saw that Boyer was wearing his buck knife, and, before he left the residence, noted that there was blood on the open knife blade. During the evening, Boyer told Kennedy not to tell anyone what had happened that night.

Cynthia Cornwell likewise testified for the prosecution under a grant of immunity and reported that Boyer and Kennedy had left the residence Boyer and Cornwell shared so that Boyer could attempt to borrow money from his parents. He had previously tried to borrow $30 from Cornwell, which she knew to be the price of cocaine, but she had no money to give him.

Cornwell testified that, later that evening, when Boyer and Kennedy returned, Boyer's knee was bleeding and he was limping. Boyer told Cornwell that he had been injured in a confrontation with a loan shark. That same day, before police officers came to their residence, Boyer asked Cornwell whether she would wait for him if something happened. When Cornwell asked what was wrong, Boyer said "something about a murder" and told Cornwell "you are going to hate me." Cornwell admitted to burning Boyer's jacket on a hibachi grill.

2

For the defense, Dr. Ernest Klatte testified as an expert witness after interviewing Boyer four times for a total of eight and three-quarter hours. In addition to those interviews, Dr. Klatte reviewed reports prepared by the public defender and the Fullerton police, a forensic report prepared by the Orange County Sheriff's crime lab, and Boyer's medical records, which included indications that Boyer had suffered two serious traffic incidents years earlier.

Dr. Klatte related Boyer's version of the events. According to him, Boyer stated that he had been injecting cocaine and drinking heavily for some time. On the day of the murders, he drank beer in the morning and half a pint of whiskey in the afternoon, smoked a PCP cigarette, and shared a quarter gram of cocaine with Kennedy. He went with Kennedy to his parents' house in an attempt to obtain money from his mother, but failed because his father was home. He then attempted to find William Harbitz, but, again, failed. The two then went to Francis and Aileen Harbitz's home to find out how to contact William. During the trip, he began to have a headache and feel the effects of the PCP. Once they arrived at the Harbitzes' residence, Aileen Harbitz invited him into her home, and subsequently suggested he go to the back bedroom to talk to Francis. As he was leaving Francis's room, Boyer noticed a billfold and then felt very strange. Boyer felt that he was part of the horror movie *Halloween II* and that events in the house were changing speeds and items were becoming distorted.

Boyer's story changed significantly over the course of his interviews with Dr. Klatte. In his early interviews, conducted in 1982 and 1983, Boyer stated he had no recollection of the

knife or the stabbing, and indeed had no recollection at all until he was outside in Kennedy's car. In a 1990 interview, however, Boyer said that he was "tripping" and hallucinated a man coming at him with a knife. Dr. Klatte testified that Boyer recalled having two wallets when he left the Harbitzes' residence, and that he admitted to discarding them.

Dr. Klatte opined, assuming Boyer told the truth about the drugs he ingested, that Boyer might have been impulsive and explosive on the night of the murders, and that he might have hallucinated. He also acknowledged Boyer had an antisocial personality and might have lied about the events in question. Dr. Klatte testified there was a significant possibility Boyer was malingering, and he was especially suspicious of the hallucination claim because Boyer had not mentioned it to him until 1990.

Lawrence Plon, a pharmacist, also testified for the defense that cocaine and PCP can produce excitement or catatonic withdrawal, aggression, paranoia, hallucinations, and delusions.

In due course, the jury returned guilty verdicts on the two murder charges.

B

At the penalty phase of the trial, the parties stipulated that Boyer pled guilty to committing a misdemeanor assault in September 1980. The prosecution also presented evidence that Boyer participated in the armed robbery of a Payless Shoe Source store cashier in 1982, during which Boyer had personally pulled a handgun on a store clerk, forcing her to open the cash register and store safe.

In addition, the prosecution sought to prove that Boyer murdered 75 year old Houston Compton in August 1980. William Harbitz testified that in August, 1980, Boyer came to his apartment door intoxicated and covered in blood and subsequently explained he had been in a knife fight. The prosecution's case relied heavily on the testimony of Linda Weissinger, who worked at a McDonald's restaurant in Whittier, California. She recalled a man driving a car that matched Compton's early 1960's Ford Fairlane—which was later found abandoned with a McDonald's restaurant bag and receipt inside—going through the McDonald's drive-through during the closing rush. Weissinger recalled the man had blood on his shirt and leaned toward the passenger side of the window as if he did not want to be seen. Despite only briefly seeing the man, Weissinger positively identified Boyer in a six photograph array in 1983 and testified that she was "sure" the man she identified in 1983 and the man she had seen at the McDonald's were the same.

Weissinger's eyewitness identification was in many ways problematic. In two live lineups, conducted in 1980 and 1981 Weissinger identified men other than Boyer as the man she saw in the McDonald's drive-through. In a later photographic array, she chose someone other than Boyer before identifying Boyer in yet another photographic array. Nonetheless, at trial, she "explained at length why she felt sure of her choice" when she identified Boyer in the latter photographic array after the prior, incorrect identifications.

Boyer presented evidence concerning the unreliability of eyewitness reports, evidence of his difficult upbringing, and significant testimony concerning his character in mitigation. In any event, the jury returned a penalty of death.

C

The California Supreme Court unanimously affirmed the convictions and sentence in Boyer's direct appeal with a reasoned opinion, *People v. Boyer*, 38 Cal. 4th 412 (2006), and the United States Supreme Court denied Boyer's petition for certiorari. *Boyer v. California*, 549 U.S. 1021 (2006). On state habeas review, the California Supreme Court twice denied Boyer's petition for a writ of habeas corpus on the merits. Boyer subsequently filed this federal habeas petition, which the district court denied in full. Boyer timely appealed.[2]

II

Boyer's claims are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA").[3] Our statutory authority to grant habeas corpus relief to state prisoners arises exclusively from 28 U.S.C. § 2254(d), which states in relevant part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

---

[2] The district court had jurisdiction under 28 U.S.C. § 2254. We have jurisdiction over the appeal from the denial of Boyer's habeas petition under 28 U.S.C. § 2253(a), and review the district court's denial of a petition for habeas corpus de novo. *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013).

[3] AEDPA sets forth the relevant standard of review because Boyer filed his habeas petition in the district court in June 2010, well after AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997); *Hedlund v. Ryan*, 750 F.3d 793, 798–99 (9th Cir. 2014).

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"[C]learly established Federal law, as determined by the Supreme Court of the United States . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (internal quotation marks omitted). "'[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law,'" because "[a] state court must be granted a deference and latitude." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). Under such deferential standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

As the Supreme Court has repeatedly been obliged to remind us, this standard is "difficult to meet . . . because it was meant to be." *Id.* at 102 (explaining that "habeas corpus is a guard against extreme malfunctions in the state criminal

justice systems" rather than "a substitute for ordinary error correction" (citation omitted) (internal quotation marks omitted)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

We apply this demanding standard to Boyer's petition, beginning with the four claims certified[4] by the district court followed by his five uncertified claims.

### III

### A

Boyer first contends the district court erred when it concluded that no clearly established federal law required the trial court to conduct a full evidentiary hearing before admitting evidence of the Compton murder at the penalty phase. Boyer urges that, at least in this case, the trial court was required to hear live testimony to determine whether the evidence tying Boyer to the Compton murder was sufficiently reliable to be admitted. He also suggests, even if such hearing were not necessary, that the evidence should nonetheless have been excluded. His argument principally relates to the testimony of Linda Weissinger.

---

[4] "Before an appeal may be entertained, a prisoner who was denied habeas relief in the district court must first seek and obtain a [certificate of appealability]." *Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003); *see* 28 U.S.C. § 2253(c).

1

On direct review, the California Supreme Court held that no error had occurred in the trial court's failure to conduct a live evidentiary hearing. Although not specifically stating that no hearing was required, it "independently conclude[d]" that "Weissinger's identification testimony at trial was not excludable . . . and [] the evidence that defendant murdered Compton was legally sufficient for consideration by the penalty jury." *Boyer*, 38 Cal. 4th at 477. On federal habeas review, the district court noted that, while the trial court had not heard live evidence regarding Weissinger's testimony, it had conducted three hearings on the matter. The district court also agreed that Boyer had identified no clearly established federal law entitling him to an evidentiary hearing.

Boyer relies principally on *People v. Phillips*, 41 Cal. 3d 29 (1985). There, the California Supreme Court explained that, before allowing the introduction of evidence concerning prior uncharged offenses, "it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity" at issue. *Id.* at 72 n.25. *Phillips*, of course, is not a Supreme Court case and so does not represent "clearly established Federal law," which embodies "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).[5]

---

[5] At oral argument, counsel for Boyer contended that our opinion in *Hurles v. Ryan*, 752 F.3d 768 (9th Cir. 2014), stands for the proposition that, when there has been a prima facie showing of a constitutional violation and a request for an evidentiary hearing has been made but no

Boyer, however, points to three Supreme Court cases he contends create clearly established federal law requiring the trial court to conduct a *Phillips* hearing. The first, *Neil v. Biggers*, 409 U.S. 188 (1972), is a pre-AEDPA case involving whether a rape victim's identification of her attacker comported with due process. Rather than identifying the accused in a lineup, police showed the victim the accused alone because no suitable lineup could be constructed from the occupants of the city jail or the city juvenile home. *Id.* at 195. The *Biggers* Court concluded such identification did not violate due process, and held the "central question" was "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199 (internal quotation marks omitted). It did not address what type of evidentiary hearing the trial court needed to conduct in determining whether the eyewitness identification could be put before the jury.

Boyer also relies on *Manson v. Brathwaite*, 432 U.S. 98 (1977). That case largely followed *Biggers*, holding "reliability is the linchpin in determining the admissibility of identification testimony" and concluding "[t]he factors to be considered [we]re set out in *Biggers*." *Id.* at 114. Like

---

such hearing has occurred, state court determinations are, in general, owed less deference on habeas review. Such contention is incorrect.

In *Hurles*, we evaluated the Supreme Court's clearly established caselaw regarding judicial bias and determined that, based on the facts of that case, the state court's denial of Hurles's judicial bias claim "rest[ed] on an unreasonable determination of the facts." *Id.* at 790. Our holding in that case does not affect the level of deference generally owed to state court determinations under § 2254(d). Boyer's claims are governed by the stringent AEDPA standard set forth by many Supreme Court cases.

*Biggers*, *Manson* contains no discussion regarding when a trial court must conduct a live evidentiary hearing before allowing eyewitness testimony. In sum, if *Biggers* and *Brathwaite* relate to Boyer's claim at all, they are of no help to him.

Boyer next points to *Watkins v. Sowders*, 449 U.S. 341 (1981). There, the Court addressed whether a "trial court is constitutionally compelled to conduct a hearing outside the presence of the jury whenever a defendant contends that a witness' identification of him was arrived at improperly." *Id.* at 342. The *Watkins* Court concluded the Constitution required no such hearing, explaining "[a] judicial determination outside the presence of the jury of the admissibility of identification evidence may often be advisable . . . [b]ut it does not follow that the Constitution requires a *per se* rule compelling such a procedure in every case." *Id.* at 349. It noted "the proper evaluation of evidence under the instructions of the trial judge is the very task our system must assume juries can perform," *id.* at 347, but also suggested that "[i]n some circumstances" a hearing outside the presence of a jury to determine the admissibility of evidence "may be constitutionally necessary," *id.* at 349. *Watkins*, though, never elaborates. *Id.* Moreover, the Supreme Court did not squarely hold that an evidentiary hearing is ever required in any particular circumstances—indeed, it did not provide any guidance as to when such circumstances might arise. A state court could reasonably conclude that *Watkins* does not constitute clearly established federal law that could entitle Boyer to relief.

More recently, in *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012), the Court examined when a trial court is obliged to evaluate allegedly unreliable "eyewitness

identification made under suggestive circumstances not arranged by the police" before such identification may be presented to a jury. The *Perry* Court held that "[o]nly when evidence is so extremely unfair that its admission violates fundamental conceptions of justice . . . have we imposed a constraint tied to the Due Process Clause." *Id.* (citation omitted) (internal quotation marks omitted). It explained "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 730. While Boyer contends Weissinger's testimony was unreliable in many respects, he does not contend such unreliability stems from unnecessarily suggestive circumstances arranged by law enforcement. Thus, *Perry* likewise does not entitle Boyer to relief.

We therefore conclude that the state court did not unreasonably apply clearly established Supreme Court precedent when it determined that federal law did not require a live evidentiary hearing to assess the reliability of Lisa Weissinger's testimony.

2

Boyer further presses the related argument that evidence of the Compton homicide should have been excluded as insufficient and unreliable. His contention takes the form of a sufficiency of the evidence claim under *Jackson v. Virginia*, 443 U.S. 307, 318 (1979) (holding that "the critical inquiry on review of the sufficiency of the evidence . . . [is] whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt").

Under *Jackson*, "evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 132 S. Ct. 2, 6 (2011) (per curiam) (quoting *Jackson*, 443 U.S. at 319). On habeas review, "the deference to state court decisions required by § 2254(d)" combines with "the state court's already deferential review" of sufficiency of the evidence claims. *Id.*; *see Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (recognizing AEDPA and *Jackson* combine to create double deference).

To buttress his argument, Boyer points to several problems with Weissinger's identification. For example, in the two live lineups, Weissinger identified men other than Boyer. She also identified men other than Boyer in photographic lineups before finally choosing Boyer in a photographic array in 1983.

In deciding no error had occurred, the California Supreme Court explained that "[i]dentification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime" and concluded that "the evidence that [Boyer] murdered Compton was sufficient." *Boyer*, 38 Cal. 4th at 480. It relied upon the fact that "Weissinger readily testified that, after careful consideration, she made a positive identification of defendant from a photo array as the McDonald's customer she saw on the night of the Compton murder," and she "explained at length why she felt sure of her choice." *Id.* The Court further explained Boyer's counsel had "a full opportunity to cross-examine Weissinger . . . about all aspects of the identification process" and that "William Harbitz provided some independent evidence of

defendant's identity as Compton's killer" by describing the August 1980 incident when Boyer informed Harbitz that he had been in a knife fight while wearing a bloody shirt. *Id.* at 481.

In light of these facts and the applicable standard of review, we conclude that, at the very least, "fairminded jurists could disagree" on the correctness of the state court's decision. *Richter*, 562 U.S. at 101 (internal quotation marks omitted). And, as the Supreme Court has repeatedly emphasized, that is all that is required.

B

Boyer next contends the district court erred when it denied his claim that his trial counsel deficiently failed to investigate the possibility that Boyer suffered from organic brain damage at the guilt phase of the trial. Based on testing performed in 2001 by Dr. Natasha Khazanov during post-conviction proceedings, Boyer contends he suffered from severe organic brain damage and, moreover, that counsel's failure to investigate such possibility amounted to ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Boyer contends evidence of organic brain damage would have bolstered defenses of unconsciousness, insanity, and unconsciousness due to intoxication.

In order to succeed on a *Strickland* claim, a claimant must "show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate deficient performance Boyer "must show that counsel's representation fell below an objective standard of reasonableness," and, in making that determination, courts must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 688–89. In order to show prejudice, Boyer must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. We can only grant relief based on counsel's alleged ineffectiveness if both criteria have been met.

Because Boyer brings his *Strickland* claim on federal habeas, he must surmount an even higher bar. On habeas review, we examine whether the state court reasonably applied *Strickland*. "The standards created by *Strickland* and § 2254(d) are both highly deferential," giving rise to "doubl[e]" deference. *Richter*, 562 U.S. at 105 (internal quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable. The question is whether there *is any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (emphasis added).

1

Boyer's claim turns primarily on his counsel's alleged failure to investigate further the diagnosis by Dr. Kenneth Nudleman. One of the several experts to evaluate Boyer's mental state, Dr. Nudleman performed an MRI on Boyer's brain, the results of which were normal. However, an electroencephalogram showed abnormalities, and Dr. Nudleman recommended neuropsychometric testing and a PET scan. No such testing appears to have been performed,

and Boyer alleges this failure to secure such testing amounted to ineffective assistance of counsel.[6]

Boyer's argument fails, however, to credit the extensive investigation his counsel performed into his mental state—indeed, Boyer was evaluated by numerous mental health experts in preparation for his multiple trials. In addition to Dr. Klatte and Dr. Plon, Boyer was evaluated by Dr. Ronald Siegel, a psychopharmacologist, who testified at Boyer's second trial that Boyer could have had a flashback, but provided no indication that he suffered from organic brain damage. Similarly, Dr. Jonathan Salk, a psychiatrist, evaluated Boyer for signs of post traumatic stress disorder, but made no mention of the possibility of organic brain damage.

Two court-appointed physicians also evaluated Boyer. One, Dr. William Loomis, a psychiatrist and neurologist, concluded Boyer was sane at the time of the crime and at the time of examination. Dr. Loomis did not credit the possibility of organic brain damage. Dr. Edward Kaufman, a psychiatrist and assistant professor of psychology, concluded that Boyer

---

[6] Boyer places great weight on a declaration by his trial counsel stating that he did not make a tactical decision when he failed pursue Dr. Nudleman's recommendations. In short, Boyer argues that the record before the state courts will only support the conclusion that counsel did not make such a tactical decision. The Supreme Court, however, has repeatedly cautioned that "[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Richter*, 562 U.S. at 109. "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110. The declaration, therefore, cannot bear the weight Boyer ascribes to it.

suffered from an antisocial personality and from chronic substance abuse. Dr. Kaufman thoroughly considered Boyer's medical history and found that it was unlikely Boyer suffered from a hallucination during the Harbitzes' murders. While Dr. Kaufman was aware Boyer had been in a car accident in 1976 and had subsequently undergone a neurological examination, Dr. Kaufman did not suggest a likelihood of organic brain damage. Rather, Dr. Kaufman stated that neurological illness was unlikely and could best be ruled out by diagnostic testing.

We have previously denied claims relating to alleged failures to investigate organic brain damage in similar circumstances. For example, in *Earp v. Cullen*, we held that the petitioner had failed to demonstrate that his trial counsel's conduct fell below *Strickland*'*s* standard on AEDPA review where medical experts "concluded that [the petitioner] had deficits in processing speed and working memory that were consistent with organic brain damage." 623 F.3d 1065, 1076 (9th Cir. 2010). We concluded counsel was not ineffective in large part because he had pursued evidence related to Earp's mental state and abilities at the time of the trial, and because a psychologist who examined Earp concluded instead that Earp was a sociopath. *Id.* Moreover, we held that the fact that Earp could produce an expert eleven years after the trial "who is willing to opine that he had organic brain damage at the time of his trial does not impact the ultimate determination of whether Earp's trial counsel insufficiently investigated that possibility." *Id.*

We reached a similar conclusion in *West v. Ryan*, where we held petitioner's counsel had not fallen below the *Strickland* standard by failing to follow up on a medical expert's conclusion that "cognitive impairment could not be

'ruled out' absent further testing." 608 F.3d 477, 488–89 (9th Cir 2010). Based on the totality of the circumstances, that remark was "not the kind of powerful mitigating evidence sufficient to overcome *Strickland*'s presumption that counsel acted reasonably in declining to investigate further the possibility . . . [of] cognitive impairment." *Id.* at 489 (internal quotation marks omitted).

In *Leavitt v. Arave*, 646 F.3d 605, 609–10 (9th Cir. 2011), we again found that trial counsel satisfied *Strickland* under similar circumstances. There, the petitioner argued trial counsel could not have made a reasonable strategic decision not to investigate further a CT scan that revealed cortical atrophy and suggested a possibility of disease. *Id.* While the petitioner's doctor "may have found some evidence suggesting a cognitive impairment," he "ultimately concluded that the results . . . were more consistent with a diagnosis of a personality disorder," and we held that no additional testing was required to satisfy *Strickland*. *Id*. at 609.

Confronted with multiple medical evaluations, none of which identified organic brain damage, Boyer's trial counsel could justifiably have concluded that further investigation was unnecessary. As in *Earp*, *West*, and *Leavitt*, we are satisfied that it was not unreasonable for the California Supreme Court to conclude that Boyer's counsel conducted a thorough investigation into his mental state and that such investigation satisfied the performance prong of *Strickland*, especially in light of the double deference owed that conclusion on federal habeas review.[7]

---

[7] Boyer also relies on *Wiggins v. Smith*, 539 U.S. 510 (2003), a case in which the Supreme Court held that trial counsel's cursory investigation into mitigating circumstances related to the petitioner's life history fell

2

Moreover, Boyer has failed to demonstrate the prejudice required to mount successfully a *Strickland* claim. In order to show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks omitted). A substantial likelihood of a different result, as opposed to a mere conceivable possibility, is required. *Id.*

In light of the compelling evidence adduced against him at trial, Boyer cannot show that there is a reasonable probability of a different result had his counsel pursued additional evidence of organic brain damage. The evidence at trial discredits the idea that Boyer suffered from a hallucination or was otherwise unconscious or insane when he murdered the Harbitzes. For example, as the California Supreme Court noted, Boyer appeared "mentally normal at all times during the evening" of the murder. *Boyer*, 38 Cal. 4th at 470–71. He tried to deflect suspicion when he saw a police patrol car and told Kennedy to drive away without attracting attention. *Id.* at 470. He disposed of the Harbitzes' wallets, did not tell either Kennedy or Cornwell about the alleged

---

below *Strickland*'*s* standard. That case is easily distinguishable on the facts. There, counsel performed no investigation into the petitioner's life history beyond reviewing a one page summary contained in a presentence investigation report and unrelated department of social services records. *Id*. at 523–24. Here, as discussed, Boyer's counsel conducted a detailed investigation into his mental state.

hallucination, and lied to both Kennedy and Cornwell to explain his knife wounds. *Id.* at 421–22.

In addition, Dr. Klatte and Dr. Kaufman, experts obtained by the defense and the trial court respectively, expressed skepticism regarding Boyer's story. *Id.* at 459–60, 470. Dr. Klatte's testimony, in particular, seriously undermined Boyer's claim he was unconscious or insane at the time of the murders when he revealed that Boyer had not informed him of the hallucination until years after the murders took place.

Thus, even if Boyer's counsel had been ineffective for failing to investigate further the possibility of organic brain damage, Boyer has failed to show there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## C

Boyer next contends the district court erred when it denied his claim that his trial counsel deficiently failed to investigate the possibility Boyer suffered from organic brain damage at the penalty phase of the trial. Boyer marshals largely the same legal arguments and facts as he employed to support his contention that counsel provided ineffective assistance of counsel at the guilt phase of the trial.

We therefore conclude that the district court did not err when it denied Boyer's claim for largely the same reasons. As we concluded in *Earp*, *West*, and *Leavitt*, and for the reasons we have already explained, we conclude that trial counsel could justifiably have decided that further investigation into the possibility of organic brain damage was unnecessary in

light of the many experts who investigated Boyer's mental state but made no mention of such condition. Moreover, the reasons we have already identified demonstrate Boyer suffered no prejudice, even supposing that his counsel's investigation was deficient. Evidence suggested that Boyer was in search of money when he entered the Harbitzes' home, that he took the Harbitzes' wallets and later hid them, that he attempted to avoid arousing suspicion as he left the Harbitzes' home, and that he attempted to mislead both Kennedy and Cornwell about the cause of injuries he sustained while inside the home. Moreover, Boyer's own experts doubted his proffered explanation of events, in part because that explanation changed significantly over time. We therefore conclude that Boyer has failed to demonstrate that counsel's alleged deficient performance in failing to investigate adequately the possibility of organic brain damage prejudiced him at the penalty phase.

## D

Finally, Boyer contends the district court erred when it concluded California's death penalty procedures do not violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Boyer argues both that the State's statutory scheme fails to narrow adequately the class of defendants eligible for the death penalty, and that prosecutorial discretion to seek the death penalty renders such penalty unconstitutional.

### 1

We have, on multiple occasions, already rejected the claim that California's death penalty scheme fails to narrow sufficiently the class of defendants eligible for such

punishment. In *Mayfield v. Woodford*, 270 F.3d 915, 924 (9th Cir. 2001) (en banc) we, sitting en banc, held that "[a] reasonable jurist could not debate . . . that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional." Likewise, in *Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002), we expressly "reject[ed] Karis' argument that the [California statutory] scheme does not adequately narrow the class of persons eligible for the death penalty," explaining that "[t]he California statute satisfies the narrowing requirement" set forth by the Supreme Court.

We therefore conclude that precedent forecloses Boyer's claim that California's death penalty scheme is unconstitutional.

2

Further, Boyer claims that prosecutorial discretion to seek the death penalty renders it unconstitutional. This argument has likewise been repeatedly rejected by the Supreme Court and our Court. *See Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (rejecting claim that Georgia's death penalty scheme was unconstitutional because "the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them"); *Proffitt v. Florida*, 428 U.S. 242, 254 (1976) (holding argument that "the prosecutor's decision whether to charge a capital offense in the first place" rendered Florida's death penalty unconstitutional represented "a fundamental misinterpretation" of Supreme Court precedent and rejecting such argument); *United States v. Mitchell*, 502 F.3d 931, 982 (9th Cir. 2007) (explaining claim that prosecutorial discretion

rendered death penalty unconstitutional was foreclosed). We again reject it.

## IV

Boyer renews his request for a certificate of appealability as to the five claims for which the district court denied such certificate. Under 28 U.S.C. § 2253(c)(2), "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." This standard is satisfied when "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Miller–El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted) (internal quotation marks omitted)); *see also Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) ("A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" (quoting *Slack*, 529 U.S. at 484)). In determining whether the substantial showing requirement is satisfied, we must not perform a full consideration of the merits. *Miller–El*, 537 U.S. at 336 ("This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.").

## A

In Boyer's first uncertified claim, he contends that the trial court erred in failing to exclude John Kennedy's testimony because such testimony was given pursuant to an

agreement which stated that Kennedy's testimony would be consistent with certain prior statements made to police. Because Boyer has not identified any clearly established Supreme Court precedent suggesting that such a clause violates due process or any other constitutional provision, we decline to grant a certificate of appealability on this claim. *See also Cook v. Schriro*, 538 F.3d 1000, 1017 (9th Cir. 2008) ("[T]here is no Supreme Court case law establishing that consistency clauses violate due process or any other constitutional provision."). We also deny certification of Boyer's second claim, in which he contends that his trial counsel provided ineffective assistance of counsel by failing to object to Kennedy's testimony based on the same inadmissability concerns. Because any such objection would have been fruitless, Boyer's counsel could not have rendered ineffective assistance of counsel by failing to make it.

B

In his third, fourth, and fifth uncertified claims, Boyer contends that the trial court erred when it sua sponte failed to instruct the jury that unconsciousness is a complete defense and failed to define unconsciousness. He also contends that his trial counsel provided ineffective assistance of counsel for failure to request such instructions. We evaluate these claims together because they arise from closely related jury instructions, and grant a certificate of appealability on each of them.

1

On direct appeal, the California Supreme Court declined to address "whether the trial court erred by failing, sua sponte, to instruct on the complete defense of

unconsciousness" and "[found] that if error occurred, it was harmless by any applicable standard." *Boyer*, 38 Cal. 4th at 470.

Boyer cites two Supreme Court cases for the proposition that the trial court violated clearly established federal law when it failed to instruct the jury that unconsciousness is a complete defense. The first, *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), merely held that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." But the Court went on to apply that principle in the context of the opportunity to call witnesses to testify rather than a trial court's obligations when instructing a jury. *See id.* at 295–303. The second case cited by Boyer is equally unhelpful. In *Rose v. Clark*, 478 U.S. 570, 577–79 (1986), the Court held only that an erroneous jury instruction regarding malice was subject to harmless error review. In short, Boyer has failed to present, nor have we identified, any Supreme Court precedent stating clearly established federal law that entitles Boyer to the jury instruction at issue. Boyer's reliance on these cases is therefore misplaced.

Moreover, even if clearly established Supreme Court precedent required such instruction, Boyer would still not be entitled to relief. The question before us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "The burden on the habeas petitioner is 'especially heavy' where, as here, the alleged error involves the failure to give an instruction." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir. 1992)).

Applying that standard, ample evidence supports the California Supreme Court's determination that any error was harmless, including Boyer's rational appearance throughout the day, his goal-directed actions following the murder (including instructing Kennedy to avoid police and disposing of the Harbitzes' wallets), the lack of evidence that Boyer told Kennedy or Cornwell about his hallucination, and his own experts' skepticism regarding the hallucination claim. *Boyer*, 38 Cal. 4th at 470–71.

2

Boyer next contends that the trial court erred when it failed to provide a jury instruction defining unconsciousness, and that such failure rendered his trial fundamentally unfair.

Boyer's claim suffers from the same deficiencies that undermine his contention that the trial court should have instructed the jury that unconsiousness is a complete defense. Specifically, he has failed to identify any clearly established Supreme Court precedent that would entitle him to have the state court sua sponte give the additional instruction he requests. Moreover, Boyer has failed to bear the especially heavy burden placed on him to demonstrate that the lack of the requested instruction so infected the trial that his Due Process rights were violated. *Estelle*, 502 U.S. at 72; *Clark*, 450 F.3d at 904.

Further, we agree with the California Supreme Court, that in light of the instructions given by the trial court, "[n]o reasonable juror could fail to understand . . . that one can perform acts while unconscious." *Boyer*, 38 Cal. 4th at 472. The California Supreme Court noted that the jury instruction given on unconsciousness by voluntary intoxication stated

that an individual who, "*'while unconscious* as a result of voluntary intoxication, *killed* another human being without an intent to kill and without malice aforethought' is guilty of involuntary manslaughter." *Id.* (quoting CALJIC No. 8.47). Moreover, an individual who becomes voluntarily intoxicated "*to the point of unconsciousness* . . . assumes the risk that *while unconscious* [he] [she] will *commit acts* dangerous to human life or safety." *Id.* (quoting CALJIC No. 8.47) (alterations in original).

3

Finally, Boyer contends that his counsel was ineffective under *Strickland* for failing to request jury instructions related to unconsciousness. As noted above, the jury was presented with numerous instructions explaining the effect of Boyer's alleged unconsciousness and thus a reasonable juror would have understood everything necessary to evaluate that theory of Boyer's defense. *See United States v. Chambers*, 918 F.2d 1455, 1462 (9th Cir. 1990). Moreover, even if that were not so, any error was harmless. As we have already detailed at length, should any error have occurred, Boyer has failed to demonstrate such error was prejudicial. *See*, *supra*, Part III.B.2; *Boyer*, 38 Cal. 4th at 470–471.

V

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.