IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75991-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ABDIRAHMAN S. SAKAWE, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 6, 2018 |

SCHINDLER, J. — The trial court convicted Abdirahman S. Sakawe of robbery and attempted robbery in the second degree and assault in the second degree. Sakawe seeks reversal, arguing (1) the court violated his right to due process by admitting unreliable in-court identification testimony, (2) the court erred in denying his motion to suppress statements he made to the police at the hospital, and (3) sufficient evidence does not support the convictions. We affirm.

FACTS

First Trial

The State filed charges against Abdirahman S. Sakawe in 2008 for robbery in the second degree of Chuan-Wen "Andre" Chuang and attempted robbery in the second degree and assault in the second degree of Ka "Charles" Chen. A jury convicted

Sakawe. We affirmed the convictions. State v. Sakawe, 150 Wn. App. 1045, 2009 WL 1664930, at *3.

Personal Restraint Petition

Sakawe filed a personal restraint petition alleging ineffective assistance of counsel. We remanded for a reference hearing. In re Pers. Restraint of Sakawe, 168 Wn. App. 1028, 2012 WL 1980895, at *1. The trial court found Sakawe "would have pled guilty if he had been properly advised regarding immigration matters." Sakawe, 2012 WL 1980895, at *2. Because the failure to advise a defendant of " 'available options and possible consequences constitutes ineffective assistance of counsel,' " we granted the petition and remanded for a new trial. Sakawe, 2012 WL 1980895, at *2-*3 (quoting In re Pers. Restraint of McCready, 100 Wn. App. 259, 263, 996 P.2d 658 (2000)).

Second Trial

On remand, the State was unable to present the hotel lobby surveillance video footage to the jury. The trial court overruled the defense objection to calling the prosecutor from the first trial to testify about the video. The defense did not object to the police officer testimony. The prosecutor and police officers testified about what they saw on the hotel surveillance video. The jury convicted Sakawe. On appeal, we held the trial court abused its discretion by allowing the prosecuting attorney from the first trial to testify about the hotel lobby video. We reversed and remanded for a new trial. State v. Sakawe, No. 70563-6-I, slip op. at 15 (Wash. Ct. App. Nov. 30, 2015) (unpublished), http://www.courts.wa.gov/opinions/pdf/705636.pdf.

Third Trial

On remand, Sakawe waived his right to a jury trial. Charles and a number of police officers testified. Because Andre and Garden Suites Hotel employee Catherine Wood were unavailable to testify, the State moved to admit their testimony from the previous trials. The defense objected to admitting the in-court identification testimony of Wood. The court overruled the objection and admitted the testimony.

The evidence showed that on the evening of November 22, 2007, two Taiwanese exchange students, Chuan-Wen "Andre" Chuang and Ka "Charles" Chen, were waiting at a bus stop when a group of approximately 10 young black males surrounded them and asked for a cigarette and the time. Andre and Charles had no cigarettes but Andre removed his cell phone from his pocket to check the time. One of the men "snatched" the phone away from him. Meanwhile, a black male wearing a red hat grabbed Charles by the throat. When Andre tried to intervene and stop the man, another black male grabbed Andre by the throat, punched him twice in the face, and then demanded money.

Andre and Charles managed to escape and ran to the Garden Suites Hotel where Andre lived. Garden Suites Hotel employee Catherine Wood was working at the front desk. When Andre and Charles ran into the hotel lobby, Charles threw his phone to Wood for safekeeping. Two men followed Charles and Andre inside the hotel. One of the men was the black male wearing a red hat who grabbed Charles by the throat at the bus stop. The other black male was wearing a white hooded sweatshirt. The man in the red hat followed Charles and Andre into the lobby while the man in the white hooded sweatshirt remained at the hotel entry. The man in the red hat punched Andre

in the face, knocking off his glasses. The man unsuccessfully tried to jump over the front counter to grab the phone from Wood. The man then confronted Charles and put him in a headlock. After Wood yelled at the man in the red hat to leave, both men fled.

Des Moines Police Officer Eddie Ochart, Officer Randy Gallagher, and Officer David Shields responded to the 911 call. The officers viewed the hotel lobby surveillance video. The officers who viewed the hotel lobby surveillance footage testified about what the video showed. The defense did not object to the police officer testimony. The surveillance video showed a man entering the hotel lobby after Charles and Andre ran inside. The man wore a black and red hooded sweatshirt, a red and black hat, and dark pants. Another man wearing a white hooded sweatshirt entered the lobby but remained by the entrance.

While at the hotel, the police learned that a group of about 10 young men had gathered within walking distance of the hotel. Officer Gallagher left. Officer Gallagher immediately recognized the young man in the white hooded sweatshirt from the surveillance video. The man in the white hooded sweatshirt was standing with another black male in dark clothing. Officer Gallagher identified the man in the white sweatshirt as Mahad Warsame and the other black male as Shirwa Muse. Officer Ochart found a cell phone with "Asian characters" on it in Muse's pocket. Andre confirmed the cell phone was the phone that was stolen from him at the bus stop. The officers arrested Muse. Muse slipped out of his handcuffs and ran away. The officers called in a K-9 unit to track Muse.

Auburn Police Department Officer Daniel O'Neil and police canine Ronin arrived at about 12:05 a.m. The dog ran into a wooded area and located and bit a young black

male who was later identified as Abdirahman S. Sakawe. Sakawe was "wearing a red and black sweatshirt and black jeans." Sakawe told Officer Shields that he was homeless and spent nights in the woods. But the officers did not find any bedding or sleeping gear and it was between 30 and 40 degrees outside that evening. The officers called medics. The medics drove Sakawe to Highline Medical Center to treat the dog bite injury.

Ronin and Officer O'Neil tracked Muse to an apartment building. Officer O'Neil then went to Highline hospital to document the dog bite injury. Sakawe told Officer O'Neil he was 17 years old and lived in Burien. Sakawe said he was in Des Moines that day "hanging out with his friend 'Shirwa.' "

The court found Sakawe guilty as charged of robbery in the second degree, attempted robbery in the second degree, and assault in the second degree. The court entered extensive written findings of fact and conclusions of law.

## ANALYSIS

Sakawe seeks reversal, arguing (1) the court violated his right to due process by admitting Wood's in-court identification testimony, (2) the court erred in admitting statements he made to the police at the hospital, and (3) insufficient evidence supports the conviction.

### 1) In-Court Identification

Sakawe contends the admission of Wood's in-court identification testimony violated the federal due process clause. U.S. CONST. amend. XIV. Sakawe asserts the in-court identification was unnecessarily suggestive and unreliable.

Before trial, Sakawe filed a motion to suppress admission of the testimony of Wood from the previous trials as "improper, suggestive in-court identification." Sakawe cited Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). The court denied the motion to suppress the testimony. The court ruled Biggers and Brathwaite did not apply because the in-court identification was not procured or arranged by law enforcement.

> Those cases that gave rise to the law that defense would have applied here would not necessarily apply to this fact pattern.
> I think that the idea is that law enforcement, police and others have to be held in check, and when they do something that improperly suggests that a person is the defendant, then there is the potential of a due process violation.

The court noted the extensive defense cross-examination of Wood in the previous two trials and ruled that "where the police are not involved," the court would determine credibility and the weight to give to the evidence.

In the first trial, Wood testified that she was working as a desk clerk at the Garden Suites Hotel at around 11:00 p.m. on November 22, 2007 when two "young Asian boys" ran into the lobby followed by two young black males. One of the Asian men "threw" her his cell phone. One of the young black men "swung at the one Asian kid, Andre, and knocked his glasses off of his face." After Wood yelled, " 'Get out of here,' " the other black male said, " 'Let's get out of here' " and "pulled" the first black male out of the building.

Wood described the clothing of the two men. Wood said the young black male who swung at Andre and knocked off his glasses was "wearing red" and the other black

male was "wearing white":

> He was, um, young and not sure if he was wearing, like — when I called
> the 911, or when I talked to them, I think I said that one of them was
> wearing white and one of them was wearing red, but I don't really recall. I
> think that the kid that was inside the building first was wearing red. . . .
> And, um, he was a black young man, and that's about all I could tell you."

Wood described the man "wearing white" as "a black young man, as well."

At the second trial in June 2013, Wood testified that the black male who

assaulted Andre was wearing a black and red "hoodie."

> Q. Can you describe that person, that third person who came in?
> A. No, I couldn't describe him much at that time, other than him being
> a black male.
> Q. Do you remember what he was wearing?
> A. He was wearing a black and red hoodie.
> Q. Can you describe any more for the jury what you mean by a black
> and red hoodie in terms of why was it black and red or?
> A. I don't — I don't recall.
> Q. Do you remember anything about that black male who came
> through the door, the third man, in terms of his size in comparison
> to Andre?
> A. They seemed similar in size.
> Q. Both height and weight or was one —
> A. I really — I really don't know.

Wood testified that the other man who entered the lobby was "a black male and

he was maybe slightly taller," and he was "wearing a black and white type hoodie."

Wood said that when she testified in the first trial, she "recognized" Sakawe.

> Q. Did you testify at a prior proceeding related to this incident?
> A. Yes, I did.
> Q. Was that back in 2008?
> A. Yes.
> Q. Was that here at the [Maleng Regional Justice Center]?
> A. Yes.
> Q. When you were in court for that proceeding, did you recognize
> someone in the courtroom?
> A. Yes, I did.
> Q. Was it your understanding that person was the defendant?
> A. Yes.

7

Q.    Did you recognize that person, the defendant in the courtroom
      when you testified before?
A.    Yes, I did.
Q.    And who did you recognize that person as being?
A.    It was the first black male that came into the building.
Q.    So I just want to make sure I'm clear, so when you testified before,
      you recognized the defendant as being the person from the lobby;
      is that — do I understand that correctly?
A.    Correct.
Q.    All right.
           How did you recognize him or what did you recognize?
A.    I just recognized his face.

Sakawe contends the court violated his right to due process by not considering the factors under Biggers and overruling his objection to Wood's previous in-court identification testimony from the second trial. Sakawe asserts the testimony was unreliable and the result of an unnecessarily suggestive procedure.

In Biggers, the Court identified the factors the court should consider in determining whether the due process clause requires the suppression of eyewitness identification procured by law enforcement using unnecessarily suggestive circumstances. Biggers, 409 U.S. at 199-200. The Court in Biggers identifies the following factors to determine the reliability of the identification:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200.

In Perry v. New Hampshire, 565 U.S. 228, 240, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012), the Supreme Court rejected the contention that judges must determine the reliability of eyewitness evidence "any time an identification is made under suggestive circumstances." The Court emphasized that "due process concerns arise only when

law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry, 565 U.S. at 238-39.

Quoting Biggers, the Court states the due process clause "requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.' " Perry, 565 U.S. at 239 (quoting Biggers, 409 U.S. at 201). Quoting Brathwaite, the Court states:

> "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation . . . . Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed.

Perry, 565 U.S. at 239[1] (quoting Brathwaite, 432 U.S. at 114, 116). Otherwise, the admissible evidence should be submitted to the jury. Perry, 565 U.S. at 239 (citing Brathwaite, 432 U.S. at 114; Biggers, 409 U.S. at 199-200).

The Court held that the rationale underlying Biggers and Brathwaite does not support "a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances." Perry, 565 U.S. at 240.

> Perry's argument depends, in large part, on the Court's statement in Brathwaite that "reliability is the linchpin in determining the admissibility of identification testimony." If reliability is the linchpin of admissibility under the Due Process Clause, Perry maintains, it should make no difference whether law enforcement was responsible for creating the suggestive circumstances that marred the identification.
>
> Perry has removed our statement in Brathwaite from its mooring, and thereby attributes to the statement a meaning a fair reading of our opinion does not bear. . . . [T]he Brathwaite Court's reference to reliability appears in a portion of the opinion concerning the appropriate remedy when the police use an unnecessarily suggestive identification procedure. The Court adopted a judicial screen for reliability as a course preferable to a per se rule requiring exclusion of identification evidence whenever law enforcement officers employ an improper procedure. The due process check for reliability, Brathwaite made plain, comes into play only after the

---

[1] Alterations in original.

defendant establishes improper police conduct. The very purpose of the check, the Court noted, was to avoid depriving the jury of identification evidence that is reliable, notwithstanding improper police conduct.

Perry, 565 U.S. at 240-41.[2]

The Court acknowledged, "Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do." Perry, 565 U.S. at 244. The Court also acknowledged the concerns surrounding eyewitness testimony, stating that " 'the annals of criminal law are rife with instances of mistaken identification.' " Perry, 565 U.S. at 245 (quoting United States v. Wade, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967)). But the Court concludes the "potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair." Perry, 565 U.S. at 245.

The Court held the constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Perry, 565 U.S. at 237. "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' have we imposed a constraint tied to the Due Process Clause." Perry, 565 U.S. at 237[3] (quoting Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)). The Court emphasized there are "other safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability." Perry 565 U.S. at 245. Such safeguards include the defendant's right to confront the eyewitness, the defendant's right to effective assistance of an attorney,

---

[2] Emphasis in original; citation omitted.
[3] Citation omitted.

10

eyewitness-specific jury instructions, the requirement that the State prove the defendant's guilt beyond a reasonable doubt, the rules of evidence, and expert testimony on the hazards of eyewitness identification evidence. Perry, 565 U.S. at 245-47.

The Court concluded, "[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." Perry, 565 U.S. at 248; see also Boyer v. Chappell, 793 F.3d 1092, 1100 (9th Cir. 2015) (Under Perry, a preliminary reliability analysis is not required unless the identification is procured by law enforcement.).

We conclude the court did not err or violate federal due process rights by admitting Wood's previous in-court identification testimony. The record shows the safeguards of the adversary system protected against placing undue weight on Wood's in-court eyewitness testimony. When asked on cross-examination at the first trial what the man wearing red "looked like," Wood admitted, "I really didn't get a lot of facial . . . . I just got, like, a side profile of the gentleman." Wood testified, "I didn't identify anybody. I saw — they brought nobody to me to identify." Defense counsel cross-examined Wood extensively in the second trial to highlight the unreliability of her testimony that she recognized Sakawe at the first trial. For example, defense counsel questions show how little Wood remembered:

> Q.   . . . And the first person, the first black person who came into the lobby, describe them for me again?
> A.   I can't really describe him to you. He is black.
> Q.   Okay.
>       All right. And what was he wearing?
> A.   As far as I know it was a black and red hoodie.

Q. When you say black and red, was it — do you remember which parts were black and which parts were red?
A. No, I don't recall.
Q. Okay. All right.
    Do you remember if the hood was up or down?
A. It was down.
Q. Down?
    Was he wearing anything else that you remember?
A. I don't remember.
Q. Did you get a look at his hairstyle?
A. No.
Q. Okay.
    Was there anything that prevented you from seeing his hairstyle or?
A. No.
Q. All right. You just don't remember?
A. Correct.

And defense counsel drew attention to Wood's failure to recognize Sakawe at the

first trial:

Q. . . . And during that prior testimony you did not identify the person in the courtroom, correct?
A. Correct.
Q. And do you remember how long you were in the courtroom for your testimony?
A. I don't really recall.
Q. Was it a similar set up to what we have today, in terms of the layout of the room?
A. Yes, similar.
Q. Okay, and so the person that you saw in the courtroom that you indicated you recognized, was he the only black male in the room?
A. I don't know.
Q. Okay.
    And you were more or less face-to-face with him [the] entire time that you were testifying?
A. Yes.

During closing argument in the third trial, Sakawe's attorney again emphasized

the inconsistencies in Wood's testimony and the limited details Wood gave about the

identification of the person who committed the crimes. Defense counsel argued Wood's

12

"ability to recall and remember is very suspicious," and the identification "is simply too tenuous" to prove Sakawe was guilty of the crimes beyond a reasonable doubt.

Sakawe also argues article I, section 3 of the Washington Constitution provides greater protection against suggestive in-court identification than the Fourteenth Amendment to the United States Constitution. We reject the State's argument that Sakawe did not preserve this argument under RAP 2.5(a). The motion to suppress the in-court identification cites both the Fourteenth Amendment and article I, section 3. Even if article I, section 3 of the Washington State Constitution provides greater protection than the federal constitution, any error in admitting the in-court identification testimony of Wood was harmless. Under a harmless error analysis, the State must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 22-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); State v. Jasper, 174 Wn.2d 96, 117, 271 P.3d 876 (2012).

Although the court refers to Wood's testimony, the record establishes the trial court did not rely on Wood's in-court identification testimony in finding Sakawe guilty beyond a reasonable doubt. The defense did not object to police officer testimony describing the hotel lobby surveillance video. The police officer testimony established the surveillance video showed a black man wearing a red hat and black and red clothing enter the hotel lobby and confront Andre and Charles. The court found the testimony of Andre credible because he was able to identify the man in the red hat as the one who grabbed Charles' throat, he was able to distinguish the man in the red hat from other members of the group, and the surveillance video and testimony of the other witnesses corroborated his description of events. The court found the testimony of Charles

credible and that the testimony of the other witnesses and the surveillance video corroborated his testimony.[4] The court found the evidence established the clothes Sakawe was wearing matched the description of the assailant in the hotel lobby surveillance video. The court noted Sakawe was located in the area where Muse fled and found Sakawe's inconsistent explanations for why he was in the area not credible.

After the oral ruling that Sakawe was guilty beyond a reasonable doubt of the crimes charged, the prosecutor asked the court about "any findings with respect to . . . the identification by Ms. Wood in the courtroom prior." The court responded, "[A]lthough that testimony would support the court's findings, . . . I deliberately did not make any reference to any identification." Because the record shows the court explicitly did not rely on Wood's in-court identification and substantial evidence supports the findings of guilt beyond a reasonable doubt, we conclude any error in admitting the in-court identification testimony from the previous trials did not contribute to the verdict and was harmless.

## 2) Statements at the Hospital

Sakawe contends the court erred by admitting the statements he made to Officer O'Neil at the hospital. Sakawe asserts he was subject to custodial interrogation and Officer O'Neil did not advise him of his Miranda[5] rights. Under the Fifth Amendment to the United States Constitution, "[n]o person shall be . . . compelled in any criminal case

---

[4] The written findings of fact and conclusions of law also state:

Wood's testimony was credible as her description of events was corroborated by both the other witnesses' descriptions of what was shown on the surveillance video and by the testimony of Andre and Charles. In addition, Wood's testimony was credible because the fact that only two people followed Andre and Charles into the hotel's lobby made identification easier.

[5] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

to be a witness against himself." A defendant must be warned of his right to remain silent and his right to the presence of an attorney before a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In In re Gault, 387 U.S. 1, 55, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967), the United States Supreme Court held the constitutional privilege against self-incrimination under Miranda applies with equal force to juveniles.

We review de novo a court's determination of whether the suspect was in custody. State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). We examine the totality of the circumstances in analyzing whether a suspect was in custody. State v. Rosas-Miranda, 176 Wn. App. 773, 779, 309 P.3d 728 (2013). The "critical inquiry" is "not the psychological state of the defendant, but simply whether his freedom of movement was restricted." State v. Sargent, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988). We use an objective test to determine custody and "whether a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004); Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

A suspect is not necessarily in custody when confined to a hospital room. In State v. Kelter, 71 Wn.2d 52, 54, 426 P.2d 500 (1967), the court held:

> [T]here was no compelling atmosphere of in-custody interrogation in the questioning of the defendant in his hospital room; and no competent evidence was offered to show that the defendant was not in full possession of his faculties at this time; nor had the defendant been placed under arrest or otherwise restrained by the police in any manner.

In J. D. B. v. North Carolina, 564 U.S. 261, 271-77, 265, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011), the Court held a "reasonable child" standard applies in analyzing whether a 13-year-old child was in custody. The Court held that "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." J. D. B., 564 U.S. at 277.

Sakawe contends a juvenile would reasonably believe he was in custody when the police questioned him at the hospital. The record shows that because the police dog attacked and injured Sakawe, police protocol required an officer to go to the hospital to document the dog bite injury. Officer O'Neil met with Sakawe to document the circumstances of the injury "with photographs and an incident report" while Sakawe was at the hospital waiting for treatment of the dog bite wound. The record shows Officer O'Neil knew Sakawe was 17 years old and planned to contact Sakawe's parent or guardian about the police dog bite. Because the undisputed record shows Officer O'Neil was aware Sakawe was a juvenile, Sakawe was not a suspect, he was not under arrest or handcuffed, and the police did not prevent him from leaving the hospital, we conclude he was not subject to custodial interrogation. The trial court did not err in admitting Sakawe's statements made at the hospital.

3) Sufficiency of the Evidence

Sakawe asserts sufficient evidence does not support the convictions for robbery in the second degree, attempted robbery in the second degree, and assault in the second degree because the State did not prove he was at the bus stop or in the hotel lobby.

The State has the burden of proving the elements of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Borrero, 147 Wn.2d 353, 364, 58 P.3d 245 (2002). Under the Fourteenth Amendment and the Sixth Amendment to the United States Constitution and article I, sections 21 and 22 of the Washington State Constitution, a criminal defendant is entitled to a " 'determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)[6] (quoting United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)); State v. Polo, 169 Wn. App. 750, 762-63, 282 P.3d 1116 (2012); State v. Johnson, 185 Wn. App. 655, 666, 342 P.3d 338 (2015).

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the evidence. Witherspoon, 180 Wn.2d at 883. Circumstantial evidence and direct evidence are equally reliable. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

---

[6] Alteration in original.

RCW 9A.56.190 defines "robbery" as follows:

A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.[7]

"A person is guilty of robbery in the second degree if he or she commits robbery." RCW 9A.56.210(1). Robbery in the second degree is a class B felony. RCW 9A.56.210(2). A person is guilty of attempted robbery in the second degree when "with intent to commit" robbery," he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). A person commits assault in the second degree if he or she, "[w]ith intent to commit a felony, assaults another." RCW 9A.36.021(1)(e).

Andre testified that while standing at a bus stop with Charles, a group of "[a]lmost ten" young black males "surrounded" them. "And then all of a sudden, I saw a black guy grabbing Charles' throat." Andre testified that the man who grabbed Charles' throat was wearing a red hat. Andre heard the man tell Charles to hand over his cell phone. Andre testified that when he tried to intervene, another black male grabbed his throat and punched him in the face twice, and "another black guy" took his phone.

Andre said two of the black males chased after them, including "the one in the red hat" who was "grabbing Charles' throat" at the bus stop. The man in the red hat

---

[7] We note the legislature amended chapter 9A.56 RCW in 2011 to add gender-neutral language throughout the chapter. LAWS OF 2011, ch. 336. Because no other changes were made to the relevant robbery statutes quoted in this opinion, we cite the current statutes.

followed Andre and Charles into the Garden Suites Hotel. After the man in the red hat "attempted to jump over the counter to grab the cell phone," the man punched Andre in the face.

Officer Shields testified that when he responded to the Garden Suites Hotel, the left side of Andre's face was red and "consistent with" a punch to the face. Officer Gallagher testified that the surveillance video showed the man who entered the hotel lobby after Charles and Andre was wearing a "black and red top," a "[r]ed and black hat," and "dark pants." Officer Gallagher said the man in the red hat and one of the victims had "a brief struggle over something." Officer Gallagher testified there was "kind of a headlock" as the man in the red hat was "grabbing at something." Officer Ochart testified that the surveillance footage showed the man who entered the hotel lobby was a "dark skinned male" who was wearing "red and black." Officer Ochart testified that this man was the one "causing the confrontation in the lobby." Officer Ochart said the video showed the man in red and black "either strike or swing at the Asian male" and at some point, the man put the other Asian male in a "headlock type move."

The hotel video also showed a black man wearing a white hooded sweatshirt enter the lobby for a "short amount of time." Officer Gallagher testified that the man in the white hooded sweatshirt was "holding the door open" for the man in the red hat.

Officer Gallagher testified that when he responded to the call about a group nearby, he immediately recognized the man wearing the white hooded sweatshirt from the hotel video. The man was standing with Shirwa Muse. Muse had a cell phone in his pocket that displayed "Korean characters." Andre confirmed the cell phone was his.

When Officer O'Neil found Sakawe in the wooded area, Sakawe was wearing "a black and red hoodie and black jeans." Sakawe had an "abrasion on his face" that looked "fresh." Sakawe first said that he was homeless and sleeping in the wooded area. But Officer O'Neil testified that it was a cold winter night and there was nothing to corroborate Sakawe was sleeping in the wooded area. When Officer O'Neil later spoke to Sakawe at the hospital, Sakawe said he "lived in Burien" and "was in Des Moines hanging out with his friends," specifically, his friend "Shirwa."

Substantial evidence supports the court's findings of fact and the findings support the conclusion that Sakawe committed robbery in the second degree, attempted robbery in the second degree, and assault in the second degree.

We affirm.

WE CONCUR:

20